MICHIGAN CROWN FENDER CO. v. WELCH.

1. MASTER AND SERVANT—CONTRACTS—MASTER ENTITLED TO ALL OF SERVANT'S TIME—PROFITS BELONG TO MASTER.

Where defendant, by his contract of hiring, agreed not to engage in any other business which would in any way conflict with his duties as manager of plaintiff's plant, part of his duties being to purchase steel for plaintiff's use, profits made in the purchase and resale of steel to other manufacturing companies, *held*, to belong to plaintiff.

2. PRINCIPAL AND AGENT—PROFITS BELONG TO PRINCIPAL.

The efforts and activities of an agent in the line of his employment should be for the benefit of his principal, and he is not at liberty to deal in the business of his agency for his own benefit.

3. SAME—DUTY OF AGENT TO DISCLOSE.

It is the duty of an agent to communicate to his principal facts relating to the business which ought in good faith to be made known to the latter.

On right of principal or employer to earnings by agent or servant who undertakes extraneous work, see notes in 5 L. R. A. (N. S.) 1154; L. R. A. 1916D, 782.

On liability of promoters of corporation for secret profits, see note in 18 L. R. A. (N. S.) 1110.

4. SAME—PROFITS BELONG TO PRINCIPAL WHETHER RESULT OF PERFORMANCE OR VIOLATION OF DUTY.

All profits made and advantage gained by an agent in the execution of the agency belong to the principal, and it matters not whether such profit or advantage be the result of the performance or of the violation of the duty of the agent if it be the fruit of the agency.

5. CONTRACTS—CONSTRUCTION — MASTER AND SERVANT — CONTRACT OF HIRING—ISSUE OF STOCK.

Where defendant was induced to leave lucrative employment and enter the service of plaintiff corporation at a less salary than he was then receiving under a contract of employment for five years, by the terms of which the day that he began his employment he was to be issued $10,000, par value, of plaintiff's stock, the same, on its issue, became his, and on his discharge by plaintiff, for cause, before the termination of the five years, said stock was not subject to be divided on the basis of the time served under the agreement, there being no such conditional provision in the contract and none will be read into it by the courts.

6. SAME—WRITTEN CONTRACT—ORAL TESTIMONY—EVIDENCE — ADMISSIBILITY.

Testimony touching the circumstances attending the making of the contract was competent, not to contradict the written agreement, but as an aid to its interpretation, its language being obscure.

7. CORPORATIONS—CONTRACTS—CANCELLATION OF STOCK—EVIDENCE—BURDEN OF PROOF.

On a bill by plaintiff corporation seeking cancellation of certain stock issued to defendant in connection with his contract of employment with plaintiff, the burden of establishing its right to relief, under its contract, rests upon plaintiff.

Appeal from Washtenaw; Sample (George W.), J. Submitted April 7, 1920. (Docket No. 4.) Decided July 20, 1920.

Bill by the Michigan Crown Fender Company against John R. Welch for an injunction, an accounting, and other relief. From a decree for plaintiff, defendant appeals. Modified, and affirmed.

*Lucking, Murphy, Helfman, Lucking & Hanlon,* for plaintiff.

*John P. Kirk* (*McGregor & Bloomer* and *Seth J. Wicker,* of counsel), for defendant.

STEERE, J. Plaintiff is a Michigan corporation organized in August, 1914, with its principal office at Ypsilanti, Michigan, since its organization there engaged in the manufacture of fenders, hoods, running-boards and other sheet metal parts for automobiles and motor trucks. Defendant is by occupation a mechanical and productional engineer of experience in automobile production and for some time before his connection with plaintiff was employed as superintendent of the sheet pressed steel department in the Dodge Brothers automobile factory at an annual salary of $6,500.. Negotiations were had between the parties looking to the employment of defendant as plaintiff's general manager, which reached a state where, as appears from plaintiff's minute book, the following action was taken at a meeting of the directors on December 14, 1915:

"Voted to enter into a contract with J. R. Welch, beginning February 1, 1916, at a salary of not less than $400 per month, and that as part consideration for his services for five years, $10,000 worth of the increase of stock be issued to him."

Their negotiations were consummated six days later and a contract was entered into as follows:

"Memorandum of agreement, made this twentieth day of December, A. D. 1915, by and between the Michigan Crown Fender Company, a corporation under the laws of the State of Michigan, of the city of Ypsilanti, in the county of Washtenaw, State of Michigan, party of the first part, and John R. Welch, of the city of Detroit, in the county of Wayne, State of Michigan, party of the second part.

"Witnesseth that for and in consideration of the covenants and agreements herein contained as follows:

"1st. The party of the first part agrees to employ the party of the second part and the party of the second part agrees and hereby accepts the position of general manager of the Michigan Crown Fender Company for the period of five years from the first day of February, 1916, at a salary of not less than four hundred dollars ($400) per month for the first year, and in proportion to the net profits for the second, third, fourth and fifth years not to exceed eight hundred dollars ($800) per month unless the profits should be so much greater, then the party of the first part will consent to the greater amount.

"2d. The first party agrees to issue to the second party one thousand (1,000) shares of the capital stock of the said Michigan Crown Fender Company at the par value of ten dollars ($10) per share on the first day of February, 1916, provided said second party assumes his duties on said date.

"3d. The second party agrees to devote all his time to the interests of and for the benefit of the first party for the full period of five years from the first day of February, 1916, and not to engage in any other business during said period which would in any way conflict with his duties to the first party, the first party to be the judge in the matter.

"4th. The second party agrees not to offer for sale his one thousand (1,000) shares of Michigan Crown Fender Company or any part thereof, to any parties until he first offers such stock for sale to said first party or to some member of the board of directors of said company.

"In witness whereof, the parties hereto subscribe their names.

"MICHIGAN CROWN FENDER CO.,
"By LEWIS MCLOUTH,
"President.
"FREDERIC F. BLODGETT,
"Secretary.
"JOHN R. WELCH.
"In presence:
"W. K. GENMAN,
"F. F. BENNETT."

As contemplated by said agreement defendant entered plaintiff's employment about February 1, 1916, and soon thereafter plaintiff issued to him 1,000 shares of its capital stock with a par value of $10 per share, which he received and yet retains. He was also thereafter chosen as a member of plaintiff's board of directors and its secretary.

At a meeting of plaintiff's board of directors at which defendant was present, held October 25, 1917, said board passed a resolution discharging him from plaintiff's employment because of claimed insubordination and activities against its interest, particularly in a certain secret transaction through which he profited to the disadvantage of plaintiff by the sale of a quantity of steel purchased from the Troy Manufacturing Company of Ohio to the Ford Motor Company of Detroit.

Soon thereafter, on November 8, 1917, plaintiff filed this bill of complaint stating in detail the circumstances of defendant's employment, discharge and reasons therefor as claimed; alleging as ground for a requested injunction that he refused to leave plaintiff's premises and kept the office keys, persisting in occupying a desk therein and assuming to give orders to the detriment of plaintiff's organization and business; that plaintiff was apprehensive he would dispose of the thousand shares of stock transferred to him pursuant to his contract of hiring, to which it is alleged he is not entitled by reason of his breach of said contract; and for final relief praying annulment of the certificate so issued him for said stock; an accounting, decree for profits shown to have been taken by him while in plaintiff's employ on resales connected with the Troy steel transaction, and that the same be declared a lien on any stock issued by plaintiff found belonging to him.

Defendant answered, denying in detail all charges

of insubordination and other misconduct charged as justification for his dismissal; alleged that the stock issued to him when he entered plaintiff's employment then became his absolutely, admitted that he had profited by the Troy steel transaction, claimed to have been purely a personal matter, and denied that the same was secret, against plaintiff's interests, in conflict with his duties or contrary to the terms of his contract of employment.

The case was heard upon pleadings and voluminous proofs, oral and documentary, taken in open court. An opinion with findings was filed following the hearing and decree rendered sustaining in the main plaintiff's contentions. The court held defendant's conduct was such as to justify his discharge, and found, which is not disputed, that he made a profit of $5,116.28 on re-sales of Troy steel to the Ford and Cadillac motor car companies; and that he did so secretly, engaging in "other business" in violation of his contract of employment, the findings and conclusions of the court upon that issue being in part as follows:

—"that he purchased of 20- and 22-gauge steel from the Troy company for the Ford Motor Car Company, and the Cadillac Company at the same time that he purchased for the plaintiff company. That it was done without the knowledge or consent of the plaintiff company; that he engaged in business which had a tendency to put him in direct conflict with the interests of the plaintiff company; that there was testimony to show that the plaintiff company was to receive out of the purchase from the Troy company 20-gauge steel, but that instead of receiving 235 tons of 20-gauge steel, it, in fact, only received 92 tons and that in order to supply the Ford company with its demands for 20-gauge steel, the plaintiff company was compelled and did take a different gauge for the balance of the 235 tons."

The profits derived by defendant from so "dealing

secretly" in steel while in plaintiff's service were held by the court as rightfully belonging to his employer, and a decree granted plaintiff against him for the $5,116.28 so obtained, with legal interest from the time he received it. Of the $10,000, par value, of stock issued to him when he assumed his duties on February 1, 1916, and entered upon performance of his contract, the court construed the contract as meaning that the "stock was to be earned in the five-year period of his services, if such services had been satisfactorily and properly rendered to the plaintiff company," held he had proportionately earned $3,500 worth, par value, at the time of his rightful discharge, ordered surrender and cancellation of the remaining $6,500 worth, par value, and gave plaintiff a lien upon his earned $3,500 worth as security for the amount of the retained profits decreed against him.

As the pleadings and testimony present the case and counsel argue it the right to discharge defendant underlies and is primarily stressed as a material issue for its bearing upon the two questions of who is entitled to this disputed block of stock and the profits on sale of steel made by defendant while in plaintiff's service. It would profit nothing to follow at length the often conflicting testimony detailing in this record of over 500 pages the business relations and activities of these parties terminating in defendant's discharge at the directors' meeting of October 25, 1917, which a sensitive member termed "this terrible session down there." At that meeting the directors sought to interrogate defendant in regard to the Troy steel purchase and sale of which there were reports that he had realized private profits. When asked as to the details of it by a member of the board he became very angry, informed them it was none of their business, refused to discuss the matter and defied them, with recriminations in caustic phraseology im-

pugning their veracity and capacity. Amongst the
"terrible" things of that session, as the directors re-
late, he called them "liars" and "little men * * *
not fit to run this kind of business," and said he had
been "continually hampered and obstructed in his work
by these little cusses who interfered with everything
he did and he didn't propose to stand it." Defendant
denied using insulting language, but said that when
asked by a director how much steel he bought for the
Ford motor company, "I answered him by saying it
was a personal matter and I refused to answer. I
thought his questions were insulting and not decent
for anybody." Eliminating the matters in dispute as
to what occurred at that meeting, it is clearly shown
that when quietly asked without accusation, by some
members of the board at least, for his version of the
transaction he replied it was his private matter, none
of their business, and declined to explain or disclose
the facts.

It is urged for defendant that the testimony of
plaintiff's own witnesses shows the conduct and man-
agement of the business by defendant prior to this
meeting was efficient and satisfactory, and any dis-
respectful conduct on that occasion, if shown, fur-
nished no legal excuse for his dismissal, in support
of which attention is called to the testimony of Charles
Bennett, president of plaintiff, himself manager of
another manufacturing company and instrumental in
securing defendant's services, wherein he stated his
belief that defendant was "a high-class steel man and
good engineer," saying, "up to the time the gentleman
made the remark to me his services were satisfactory
to me. I would have been satisfied if he had behaved
at the two meetings of which I spoke. I would have
voted for him as general manager," and other answers
to like effect. This witness, however, further said of
the October meeting and defendant's services:

"He absolutely would not make any reply to our question. There was nothing said or done to Mr. Welch that night aside from the questions to him about his individual transaction with the Troy Manufacturing Company, that would provoke him. He never told me or any of the other officers that he bought steel there on his own account. * * * The man was insubordinate, insulting and abusive to the directors and we had the right to discharge him for that cause. * * * I was trying to fix it up so that Mr. Welch could do his own questioning and satisfy us this was or was not done to keep us from trouble and not to make money. I did not say that if it was true, we were going to vote to discharge him. If I had known he had made the purchase without our knowledge or consent, I suppose that I would have voted to discharge him. I don't consider he had made a success of the company. He had failed to do many things he said he would. The company was in better condition than when he took it. I said I believed in Mr. Welch's honesty and integrity up to the very last minute. * * * When I got that information (of his secret profits) that was the first thing that shook my belief in his honesty. * * * I would not say that I was perfectly willing to have him continue as general manager after that was brought to my attention."

As the testimony of plaintiff's directors outlines the causes of friction which culminated in defendant's discharge at the October meeting, he early assumed a dictatorial attitude towards them, objected to and pronounced unnecessary so many meetings of the board, saying, "if he needed the directors he could send for them," at times disregarded instructions of the board and evaded questions put to him by members, emphasized that he "was used to doing business with large men," and other things which one of the members designated as "minor differences" which were "ironed out" at the time. In May, 1917, he asked for an increase of salary which was not granted owing to the then financial condition of the company which had

not yet paid any dividends, resulting in his becoming angry, at which time, as the president of the company testified, he called them "d—d little people, and said to never mind he would get it any way." It is charged in plaintiff's bill and testified to by W. R. Brace himself, that defendant soon thereafter and while yet in plaintiff's service told Brace, who was plaintiff's other experienced man in sheet metal work, and in charge of manufacturing under defendant, with whom he was then very friendly, that he might leave the company in the near future, and asked if Brace would quit with him.

Much space in the record and briefs of counsel is devoted to testimony and argument relating to the Troy steel transaction, which in comparatively brief outline is as follows: On June 18, 1917, plaintiff took a contract to supply the Republic Motor Truck Company of Alma with auto parts which required over $800,000 worth of material. It was defendant's duty to secure this material to the best advantage possible for his company. He told its directors that they needed 200 tons of 20-gauge steel and was authorized to procure it. He had visited over 20 mills during the latter part of June and fore part of July without success, when he learned that the Troy Manufacturing Company, of Troy, Ohio, had a supply. He telegraphed them on the subject and then went to Troy, on July 7th, where he found they had 700 tons of 20- and 22-gauge steel, which they would sell as a whole at a stated price but declined to split the lot and sell him the quantity he wanted for plaintiff. He advised them he would look for some one to take the balance which his company would not need. He returned to Ypsilanti where he rejected about 150 tons of steel shipped to plaintiff by another manufacturing company on account of alleged defects, went to Detroit where he interviewed a steel salesman of his acquaint-

ance named Love and through him was introduced to the purchasing agents of the Ford and Cadillac companies with whom he negotiated a sale of the surplus Troy steel at an advanced price, by which he realized the profits stated and $562 which went to Love for assisting him. He negotiated the deal with the Ford company on his individual account and for his sole profit. Love testified the steel could have been sold as easily for plaintiff as for defendant. There was a shortage of steel, the price advancing, and it was easy to sell it. He took the Ford order on July 17th and wired the Troy company he was ready to close the deal. There was considerable correspondence and telegraphing on the subject in arranging details and making the deals. Defendant worked at this during business hours, using plaintiff's stenographer at its office whom he told to keep quiet about the transaction and destroyed some of the stenographer's notes on the subject. He also corresponded with Love indicating that he had other large deals on hand and as a matter of fact he did on the side a gross steel business in his own name of over $100,000. Plaintiff's officers claim that had they been advised their company was financially able and they would have approved handling the deal with the Troy concern through defendant for the benefit of the company. While they knew of the Troy transaction in a way and understood defendant as their manager was working to get what steel their company wanted to the best advantage, as they supposed, the officers of the company were not advised of the opportunity of which defendant availed himself until later. While there is some controversy upon that point, this is made plain in defendant's brief, where it is said:

"He did not inform his directors of the purchase by himself and since his purchase of the balance of the 700 tons of steel, released the steel required by plaintiff for its immediate needs to go on with con-

tract No. 251 with the Republic Motor Truck Company," etc.

The steel wanted by plaintiff in July, 1917, for its Republic contract was 200 tons of 20-gauge steel which is a thicker sheet metal than 22-gauge, and the quoted finding of the trial judge as to defendant favoring the Ford and Cadillac companies to plaintiff's disadvantage in that particular is borne out by the testimony.

Defendant was not only in the service of plaintiff, employed as its general manager, one of his duties as its agent being to purchase steel for its use, but he was also a director and officer of the corporation. It was his duty to make the best bargains possible for his company. By the terms of his contract of hiring he expressly agreed "to devote all his time to the interest of and for the benefit of" plaintiff, and while in its service "not to engage in any other business * * * which would in any way conflict with his duties" to it, as to which matter plaintiff was "to be the judge." In the Troy steel transaction, where he admittedly made a profit of over $5,000, he assumed to be the judge of whether his interests conflicted with his duties, refused to discuss the question with plaintiff's directors and told them it was none of their business.

But independent of the express terms of his hiring, as to engaging in other business, it is an elemental rule of agency that his duties required his efforts and activities in the line of his employment should be for the benefit of his principal, and he was not at liberty to deal in the business of his agency for his own benefit. It was his duty to communicate to his principal facts relating to the business which ought in good faith to be made known to the latter. This subject is quite fully covered in the annotations to *Leathers* v. *Canfield* (117 Mich. 277), found in 45 L. R. A. 33, and further authorities need not be cited. The corol-

lary to that fundamental rule is thus concisely stated in 1 Mechem on Agency (2d Ed.), § 1224:

"The well settled and salutary principle that a person who undertakes to act for another shall not, in the same matter, act for himself, results also in the other rule, that all profits made and advantage gained by the agent in the execution of the agency belong to the principal. And it matters not whether such profit or advantage be the result of the performance or of the violation of the duty of the agent if it be the fruit of the agency."

Where the agent is also an officer of a corporation for which he is acting there is added reason for rigidly adhering to the rule. This court recently had occasion to apply it in *Garber* v. *Town*, 208 Mich. 1. Much there said and held is well in point here. The trial court rightfully decided that defendant's discharge was justified and the conceded profits made by him in the Troy deal were made in connection with and execution of his agency, and belonged to plaintiff.

As to the $10,000 worth of stock, a somewhat more complicated question is involved. Counsel on both sides claim the contract is explicit, complete and unambiguous upon that subject beyond any question of construction or interpretation, but are at marked variance as to what it does mean. For defendant it is contended that by its terms he became absolute owner of the stock when it was transferred to him, being then of doubtful value and given as an inducement to abandon an assured position with higher pay and enter plaintiff's employment; while it is urged for plaintiff the stock was conditionally transferred to him as advanced wages, or a part of his compensation for a five-year period of service. The written agreement contains but four contracting paragraphs. The first is in itself a complete contract of hiring in a stated employment, for a definite period at a specified minimum wage, with a stated maximum contin-

gent on profits. No further direct mention of or reference to wages, or compensation for services, appears anywhere in the instrument. The second paragraph gives defendant this stock on one expressed condition. By it plaintiff—

"agrees to issue to the second party 1,000 shares of the capital stock of the said Michigan Crown Fender Company at the par value of ten dollars per share on the first day of February, 1916, provided said second party assumes his duties on said date."

The third is exclusively supplemental of the first paragraph, requiring defendant to devote his time to the interests of his employer and not engage in other business except as plaintiff might permit. The fourth and last paragraph, supplemental of the second, only specifies that before offering for sale his thousand shares of stock to others, in whole or in part, defendant shall offer it to plaintiff or one of its directors. No other named restriction on his ownership of this stock is to be found anywhere in the written agreement. If any appears it is a matter of inference and construction. In that field of inquiry the language employed, subject-matter and surrounding circumstances under which the parties entered into the agreement are all proper subjects for consideration as aids in determining their intent and mutual understanding.

Both parties have fully performed under the stated requirements of paragraphs 2 and 4. This stock is nowhere else mentioned. It is undisputed that on the date specified defendant assumed his duties, entered plaintiff's employment, which he never voluntarily abandoned, and on or about the same date plaintiff issued the stock to him. No claim is made that he ever offered the stock for sale in violation of paragraph 4 and plaintiff alleges in its bill of complaint "that said stock is now in possession of said defendant and is now owned by him." This at least fixes

the title of the stock in him. Adverting to the surrounding circumstances and situation of the parties when the contract was made it appears undisputed that plaintiff's officers sought out and induced defendant to give up an assured position paying him a larger salary to manage for it a comparatively new and as yet unprofitable business. He had made good in his position with Dodge Brothers, was receiving $6,500 for that year, with a position open to him for the ensuing year at a salary of $8,500, as he testifies and is not denied. He was solicited to make the change personally, and by letter. As early as July, 1915, a proposition was made to him by plaintiff and he was asked, if not acceptable, to make a counter proposition. It is evident from the minutes of the directors' meeting quoted they then had in mind that the stock they would issue defendant should be given as "part consideration for his services," as is now urged the contract should be interpreted; but it is significant that the express provision to that effect which they took the trouble to enter in their minutes was entirely omitted from the written agreement soon thereafter prepared, accepted and executed by both parties.

Pursuant to this agreement defendant in good faith gave up the position he had with its larger salary and opportunities and assumed his duties in plaintiff's service on the date fixed where he remained for over a year and a half organizing and managing defendant's business efficiently and successfully until it was developed past the experimental stage, and during his incumbency as manager experienced a marked growth and prosperity as a manufacturing institution. In that particular it can fairly be said he made good, and accomplished the primary purpose for which his services were secured. The delinquency leading to his dismissal was aside from this.

Throwing up a profitable position, changing his plans

and casting his lot with plaintiff's uncertain enterprise for a reduced wage was no small consideration in itself. While not directly in point, the importance of a radical change in situation and sacrifice of opportunity as a distinct consideration is emphasized in *Welch* v. *Whelpley*, 62 Mich. 15, where a father agreed with a daughter and son-in-law that if the latter would reject an offer of employment and they would move near him upon a tract of land he would give it to them. It was there said:

"This contract, which, for what was beyond doubt in the eyes of the parties an important and valuable consideration, called on complainants to fix their home on the land in question, was fulfilled when they did so in good faith."

A like thought is expressed in *Russell* v. *Russell*, 94 Mich. 122.

We cannot conclude that the contract yields to a construction authorizing the court to split, or divide up, this block of stock on the basis of time served under the agreement. Defendant was given the entire thousand shares when he gave up his former position and took up the management and development of plaintiff's business on a stated monthly wage. He then concededly had possession of and title to the stock, with no expressed restraint in the written agreement on his acts of full ownership except that if he desired to sell he must give plaintiff, or its officers, the first chance to purchase. It became his then or not at all.

When this suit in equity was begun plaintiff conceded and alleged that defendant was in possession of and owned the stock, voluntarily issued and turned over to him by plaintiff. The written agreement neither directly states, nor plainly makes absolute as plaintiff contends, that his ownership was to be or is conditional. Plaintiff is seeking cancellation of his

title, and restoration to itself of possession and ownership. No complete failure of consideration is shown on which to base such claim. The burden of establishing its right to relief under this contract rests upon it. We find no sustaining inference in the contract itself imperative to enforce as a manifest equity. The testimony admitted by the court touching the circumstances attending the making of the contract was competent, not to contradict the written agreement, as plaintiff contends, but as an aid to its interpretation. For such purpose, when the language is obscure or the implications claimed not imperatively manifest, both preliminary negotiations and surrounding circumstances may be considered.

Plaintiff has not affirmatively established its right to the stock in dispute formerly issued by it to defendant. The decree will be modified to leave his ownership of the same undisturbed, all subject to plaintiff's lien for profits as decreed against him, and otherwise stand affirmed with costs to appellant in this court.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.