[No. 29264. Department One. April 16, 1945.]

THE STATE OF WASHINGTON, *on the Relation of Everett Trust & Savings Bank, Appellant,* v. PACIFIC WAXED PAPER COMPANY *et al., Respondents.*[1]

[1]Reported in 157 P. (2d) 707.

846

*O. D. Anderson,* for appellant.

*Falknor, Emory & Howe,* for respondents.

GRADY, J.—This action was brought by the state of Washington on relation of Everett Trust & Savings Bank, as executor of the estate of Alvah H. B. Jordan, to secure a writ of mandamus commanding the Pacific Waxed Paper Company, a corporation, and its president and secretary, to transfer on its books certain shares of its corporate stock formerly owned by the Paine-Mitchell Co., a dissolved corporation, and to issue to the executor shares in lieu thereof, free of the limitations and restrictions which had been attached to the stock owned by it, and to recognize the right of the executor to vote the stock at all meetings of the stockholders of the corporation. An alternative writ of mandamus was issued by the superior court, to which return was made by the defendant by an answer to the petition. A trial was had before the court, at the close of which findings of fact and conclusions of law were made, and based thereon a judgment was entered dismissing the action. The court denied a motion for a new trial. The relator has taken an appeal from the judgment.

In this opinion, we shall refer to the executor of the Jordan estate as appellant, the Pacific Waxed Paper Company as respondent, and the various interested individuals by their surnames.

The factual situation, so far as is necessary for a consideration of the legal questions presented, is as follows:

On July 20, 1931, Jordan was the owner of all of the capital stock of the Paine-Mitchell Co. except a few qualifying shares, and owned one preferred share of the respondent.

At this time, Engle was the owner of preferred and common stock of respondent, which stockholdings had increased by December 11, 1942. On July 20, 1931, Paine-Mitchell Co. was the owner of common stock of respondent. All of the stock had voting power. The combined shares of Engle and Paine-Mitchell Co. were more than a majority of all of the issued stock.

On July 20, 1931, Engle and Paine-Mitchell Co. entered into a written agreement by which each party gave to the other a promise that, before he sold or caused to be transferred any part or portion of the stock then owned and held by him, he would notify the other party in writing of his intention to sell such stock or to cause the same to be transferred; also in the notice he would state the amount he had been offered for the stock and the price, terms, and conditions of the proposed sale, and for a period of fifteen days the other party could have the exclusive right and option to purchase the stock proposed to be sold for the price and upon the terms and conditions stated in the notice. The agreement provided that it should remain in force for a period of twenty-five years from its date.

On March 24, 1932, Engle, Paine-Mitchell Co., and Jordan entered into a written agreement in which they recited their respective stockholdings in respondent and that the fact Jordan owned all of the stock of Paine-Mitchell Co. except qualifying shares constituted him the directing and managing executive of that corporation. The contract also recited that the assured continuation of the present co-operation between the parties thereto in the conduct of the business of the respondent and of its present policies resulting therefrom even after the death of either Engle or Jordan would be of inestimable value not only to the stockholdings of the parties and to the credit and financial position of respondent, but also to the interests of the minority stockholders.

Based upon this background, the parties then agreed that, in the event of the death of Engle, if Paine-Mitchell Co. was then the owner of any of the stock of respondent it

should be entitled to vote any stock owned by Engle in respondent at all meetings of stockholders of respondent for so long a time as Paine-Mitchell Co. continued to be the owner of the stock in respondent it owned at the time of the death of Engle. It was also agreed that, to fully effectuate the objects and purposes of the agreement, it should be deemed to be and should be the irrevocable proxy of Engle's heirs and legal representative to Paine-Mitchell Co., with full power of substitution to vote the Engle stock at all the meetings of stockholders of respondent.

The contract also provided, in the event of the death of Jordan, that Engle should have the same voting right as to the stock of respondent owned by Paine-Mitchell Co. and Jordan, or either of them, and contained a similar irrevocable proxy provision in favor of Engle binding upon the successors, heirs, and legal representatives, respectively, of Paine-Mitchell Co. and Jordan. It was expressly provided that the contract should not in any way affect the one of July 20, 1931, between Engle and Paine-Mitchell Co.

On May 31, 1942, Jordan died testate. In his will he named appellant as executor, and it was appointed as such when the will was admitted to probate. The executor caused the Paine-Mitchell Co. to be voluntarily dissolved, and as a result the stock owned by it in respondent was transferred to appellant. The appellant sought to vote the stock at a meeting of the stockholders of respondent on February 26, 1943, but was denied the right to do so because of the proxy held by Engle.

The ultimate question to be decided is whether the proxy to vote the stock of respondent owned by Paine-Mitchell Co. and Jordan was revocable.

The appellant also raises the questions whether the option agreement was a violation of the rule against perpetuities and whether the voluntary dissolution of Paine-Mitchell Co. automatically revoked the proxy.

Upon the question of whether the option agreement was invalid because it violated the rule against perpetuities, respondent asserts that it was not raised in the court below.

We have held many times that questions not raised in the court below will not be considered on appeal. We do not wish to depart from that rule, but it has its limitations. If the question is one that upon its answer depends whether the complaint states a cause of action and the complaint cannot be amended, then it may be raised at any time. *Fick v. Jones,* 185 Wash. 365, 55 P. (2d) 334. In the case at bar, the complaint set up the option agreement. If for any reason it was a void agreement, on appellant's theory the complaint would state a cause of action because the agency created by the proxy agreement was revocable. The theory presented by respondent on this branch of the case was that the option agreement created an interest in the subject matter of the agency of Engle to vote the stock and the proxy was irrevocable. Any reason to the contrary would support the complaint, and it may be urged at any time on the same principle that any question affecting the statement of a cause of action in a complaint, when it is incapable of amendment, may be urged at any time. We shall therefore consider the question as it is now presented.

We have adopted the statement of the rule against perpetuities as set forth in 21 R. C. L. 282 in *Denny v. Hyland,* 162 Wash. 68, 297 Pac. 1083, as follows:

" 'The rule against perpetuities is usually stated as prohibiting the creation of future interests or estates which by possibility may not become vested within a life or lives in being and twenty-one years, together with the period of gestation when the inclusion of the latter is necessary to cover cases of posthumous birth,' "

and stated:

"The rule, however, applies only to the vesting of future estates, and does not apply to vested estates. The rule has reference to the time within which the title vests and has nothing to do with the postponement of the enjoyment."

The option agreement did not create a future estate or interest to become vested at some future time. It was a promise by an owner of stock in a corporation that if at any time during the next twenty-five years he desired to sell his stock, he would give the promisee the first opportunity

for a period of fifteen days to purchase it at such price and upon such terms and conditions as the promisor had been offered. It was in effect a promise to give an option in the event the promisor desired to sell his stock. When an attempt is made to apply the above rule to this situation, it becomes apparent that it was not violated by the option agreement.

■ The general rule is that a proxy given by a stockholder to vote his corporate stock at a meeting of stockholders of a corporation is revocable by him even though the proxy by its terms is expressly made irrevocable.

Exceptions to this rule, as well as the general rule, are set forth in *Arcweld Mfg. Co. v. Burney,* 12 Wn. (2d) 212, 121 P. (2d) 350; 2 Am. Jur. 61; 5 Fletcher, Cyclopedia Corporations (Perm. ed.) 187; 2 Thompson on Corporations (3rd ed.) 356; 2 C. J. S. 1153 and 1159.

The exceptions are: (1) Where the authority or power is coupled with an interest; (2) where the authority is given as part of a security or is necessary to effectuate such a security.

■■ In the *Arcweld* case, in defining "power coupled with an interest," we said:

"A 'power coupled with an interest' is a power or authority to do an act, accompanied by or connected with an interest in the subject or thing itself upon which the power is to be exercised, the power and interest being united in the same person."

With reference to the second exception we said:

"The second exception to the general rule that a principal may revoke the power at will arises where the authority is given as part of a security or is necessary to effectuate such security. In such cases the 'interest' of the agent is something more than an interest in being permitted to exercise the power, yet something less than an estate in the subject matter or thing upon which the power is to be exercised. The purpose of the power of attorney in such cases is ordinarily to afford to the agent protection for money advanced or obligations incurred by him."

It will be observed that, as to the first exception, we did not limit the "interest" to *the thing itself* upon which the

power is to be exercised, but we also included the *subject* upon which the power is to be exercised. In many cases they are the same, but in other instances they may be different. Many of the cases under the facts before the court lay down the broad rule that the "interest" referred to must be in *the thing itself*, and if applied literally to the case before us it would mean that, in order to come within the exception, it would be necessary that Engle have some kind of a title to or estate in the shares or certificates of stock; but according to the interpretation we have given the exception, it is sufficient that the proxy holder have an "interest" in the *subject matter* upon which the power is to be exercised. The "thing itself" may refer to the tangible shares or certificates of stock, but the "subject" or "subject matters" may refer to the intangible voting right and the incidental control of the corporation. Ordinarily, the purpose of a power of attorney under the second exception is to afford the agent protection for money advanced or obligations incurred by him for his principal, but the term "security" has not always been so limited by the courts. The word "security" as used in this connection is somewhat elastic, and cases we later cite disclose that, whenever the purpose to be served by the exercise of the power is to protect or further the interest of the proxy holder, the authority given is regarded as a part of a security or something necessary to effectuate such a security.

It is clear from the proxy agreement and the facts of this case that the parties intended that the Paine-Mitchell Co. stock should be used in conjunction with the stock owned by Engle so that the policies of the respondent could be thus controlled. This is apparent from the fact that it was agreed the proxy should exist and continue until such time as Engle should sell or dispose of the stock owned by him at the time of the death of Jordan. The control of the affairs of the corporation was of much importance to Engle. By such control, his own stock interest in the corporation was made more secure. To effectuate this purpose, the parties had executed the option agreement, and in the proxy agreement it was provided the mutual proxy should be "in

the event and under the conditions and for the period stated" an irrevocable proxy of the respective parties and their successors, heirs, and legal representatives. This was a much broader and more far reaching arrangement than will be found in the ordinary proxy given to vote stock at a stockholders' meeting, at which the proxy holder does no more than act as the agent of the owner of the stock for a specific purpose.

In the situation we have before us, Engle was more than a mere agent. In voting the stock, he served purposes of his own in maintaining control of the corporation by the choice of directors and the determination of its policies and business affairs. This voting of the stock for these purposes was the subject matter of the agency. Engle acquired an interest in the subject matter of the power given to him, and this interest was coupled with such power. The power to vote the stock was necessary in order to make Engle's control of the corporation secure. The interest of Engle was something more than merely being permitted to vote the stock. It is true that Engle was not given any title to the certificates of stock themselves nor any lien upon them, but they were not the subject matter of the agency or power given. The certificates represented and were evidence of the right of the owner of the stock to be paid dividends, to share in the property of the corporation upon its dissolution, and the right to vote at meetings of stockholders. The proxy gave this latter right to Engle. The mutual arrangement as a whole created something like a community of interest in the stockholdings of the parties, having for its purpose the use of their stock as a unit, and the effect of which was to give both parties an interest in the voting of the stock, although the power to vote was to be exercised by Engle after the death of Jordan or by the Paine-Mitchell Co. after the death of Engle. The power was coupled with an interest, and by the entire arrangement between the parties the power was intended to be and became a security to effectuate the main purpose of the agency.

We have not been able to follow respondent all of the way in its contention that the option agreement created an interest in the subject matter of the power conferred. Irrespective of any recital in the agreement, the parties did no more than promise to give to each other an option to purchase in the event either had a proposal to buy his or its stock; but we do think the option agreement must be considered with the proxy agreement in determining the intention of the parties and whether Engle had an irrevocable proxy.

The cases to which our attention has been called, and those we have found, are not of much aid because their factual situations are so different from the facts of this case. Those we cite are only for the purpose of demonstrating that there has been a recognition of the view that a proxy to vote stock may be given, and in the exercise of the power a purpose is served that is beneficial not only to the donor of the power but also to the proxy holder, the corporation, and the other stockholders, and that in order to effectuate a general purpose and plan the proxy would have to be irrevocable. The court in each of those cases reached the conclusion that the proxy was irrevocable because the particular agreement that was made not only created a power, but it also gave the proxy holder a necessary interest in its subject matter. Other reasons assigned were that the proxy holder held and exercised the power to secure and make possible the furtherance and the protection of his own interests; also that the power was based upon a valid consideration moving from the proxy holder to the one who gave the proxy to him.

The best approach to the general question we have been able to find is what was said by the court in *Lane Mtg. Co. v. Crenshaw,* 93 Cal. App. 411, 269 Pac. 672, as follows:

"It is most difficult to frame an all-embracing definition of a power coupled with an interest. Most of the authorities on the subject seem to concede that such a power is recognized by the law, and when found to exist in any given case it is not revocable at the will of the principal and even survives his death. The question ever present is as to when

such a power exists, and what conditions must be shown to manifest its existence. Many of the authorities approach the subject as though it were a thesis, and treat it in such an academic way as to be confusing. Much is said concerning what is not a power coupled with an interest, with little attempt at exactness concerning what actually constitutes the same. Some confusion arises in applying the doctrine of the older cases for the reason that the law of agency has, like other legal doctrines, undergone some change throughout the years. This is particularly so with reference to the limitations of certain powers of agency and the erstwhile presumptions attaching. Likewise certain terms current years ago at the present writing convey meanings entirely different from the then general acceptation."

In the *Lane* case, the agent, in acting as such, was in a position to protect a subleasehold interest held by it, in that its authority to manage the whole building enabled it to keep the lease in good standing and thus protect its sublease of a part of the building from danger of loss if the lease was forfeited for breach of its terms. The court decided that, as the power granted the agent furnished the means of preserving its subleasehold interest, it was a power coupled with an interest and not revocable by the donor. The following cases are to the same effect: *Hey v. Dolphin*, 92 Hun (99 N. Y.) 230, 36 N. Y. Supp. 627; *Smith v. San Francisco & N. P. R. Co.*, 115 Cal. 584, 47 Pac. 582, 56 Am. St. 119; 35 L. R. A. 309; *Chapman v. Bates*, 61 N. J. Eq. 658, 47 Atl. 638, 88 Am. St. 459.

■ We think the principles of law as pronounced in *Arcweld Mfg. Co. v. Burney*, 12 Wn. (2d) 212, 121 P. (2d) 350, and the foregoing cases, when applied to the facts of this case, compel the conclusion that Engle had a power coupled with an interest and that the authority was given to him as part of a security and was necessary to effectuate such security, and therefore the proxy was not revocable by appellant.

■ The respondent contends that the proxy agreement was irrevocable for the additional reason that it was supported by a valid consideration, in that the parties to it made mutual promises to each other. The appellant argues

that mutual promises do not constitute a valid consideration to support a proxy agreement. The authorities cited by appellant, in support of his position, related to voting trusts. There were no mutual promises between the trustee who did the voting and the parties who authorized him to vote. This factor is sufficient to distinguish those authorities from the case before us. It is an elementary rule that mutual promises by parties to a contract constitute a valid consideration, but this does not solve the problem. When it is said that an agency is irrevocable, it may be meant that there exists no legal right to revoke, or that the principal is without the power to revoke.

The authority to act for a principal may be taken away and the agent may have no recourse; but a contract between a principal and an agent may be such that, although the authority to represent the principal may be terminated, such act would be a breach of contract and the agent be entitled to recover any damage sustained, or the agency may be of such a character that the power to terminate the authority to act for the principal does not exist. This subject is very well covered by what is said in 2 C. J. S. 1164:

"Where an authority or power is conferred upon the agent for a valuable consideration, it may not be lawfully revoked, without cause, by the act of the principal alone, in the absence of a stipulation that it shall be revocable, whether or not expressed to be irrevocable; but the additional qualification has been added that a covenant against revocation must be supported by an independent consideration, and the fact alone that the agent transacted his principal's business so as to entitle him to compensation out of the proceeds is not in itself such a consideration from the agent as will preclude a revocation of the authority by the principal. Where, however, a principal granted to the agent an exclusive authority to sell, it was held that the agent's agreement to pay his accounts and faithfully perform was a sufficient consideration for the principal's implied agreement not to revoke.

"Although there are statements in the cases to the effect that an authority granted for a valuable consideration takes away both the right and the power of the principal to revoke the agency and creates a power coupled with an in-

terest, it would seem that these statements mean no more than that as between the principal and agent there is no right to revoke the agency . . . or else such statements are made with reference to a state of facts showing that the power was actually coupled with an interest . . . or that such power was given as a security . . . which circumstances are referred to as the consideration for the power."

In view of the reasons upon which we have based our conclusions in the case, we deem it unnecessary to decide whether the proxy agreement was supported by such a consideration as would make it irrevocable in the sense that the principal did not have the power of revocation; but this element has been taken into consideration by us in reaching our conclusions.

■ The appellant contends that the proxy in question is in violation of that part of Rem. Rev. Stat. (Sup.), § 3803-28 (4) [P. P. C. § 449-3]:

"The validity of every unrevoked proxy shall cease eleven months after the date of its execution unless some other definite period of validity shall be expressly provided therein, but in no event shall a proxy, unless coupled with interest, be voted on after three years from the date of its execution."

This statute cannot be held to apply to the proxy agreement now under consideration because it was made March 24, 1932, and the statute did not go into effect until June, 1933. The section of the corporation act of 1933 (Rem. Rev. Stat. (Sup.), § 3803-61 [P. P. C. § 441-25]), providing that it shall be applicable to any existing corporations formed under incorporation laws of the state, does not apply to contracts entered into before the effective date of the act, and this is made apparent by Rem. Rev. Stat. (Sup.), § 3803-63 [P. P. C. § 441-29], which provides that the corporation act shall not impair or affect any act done or right accruing, accrued, or acquired prior to the time of its effective date, but that the same might be enjoyed, asserted, or enforced as fully and to the same extent as if the act had not been passed.

■ The voluntary dissolution of the Paine-Mitchell Co. did not affect the proxy agreement so far as the rights of Engle were concerned. The rule seems to be that, when a corporation is dissolved by its voluntary act, the corporation remains bound by its outstanding executory contracts. *Mayflower Realty v. Security Savings & Loan Society,* 192 Wash. 129, 72 P. (2d) 1038; 75 P. (2d) 579.

The option and proxy agreements were both based upon a valid consideration. The proxy agreement provided that the proxy should be irrevocable. The agreements did not violate any rule of public policy. Their purposes were lawful and beneficial to the parties to them, and no sufficient reason has been given why the intention of the parties, as expressed in them, should not be carried out.

The judgment is affirmed.

BEALS, C. J., MILLARD, STEINERT, and JEFFERS, JJ., concur.