Argued April 4; affirmed as modified June 6; motion for
modification denied June 27, 1950

# MARNON *v.* VAUGHAN MOTOR CO., INC.

219 P. (2d) 163

In Banc.

*Ralph R. Bailey* and *James G. Smith* argued the cause for appellants and cross-respondents. On the brief with James G. Smith were Maguire, Shields, Morrison & Bailey, and Frank C. Howell, all of Portland.

*John C. Veatch* argued the cause for respondent and cross-appellant. On the brief were Veatch & Bradshaw, of Portland.

LATOURETTE, J.

This is the second time this case has been before the court. The decision on the former appeal is set out in 184 Or. 103, 194 P. (2d) 992. The dispute between the parties arises over a written contract entered into between them on September 30, 1937, which was set out in full in the opinion on the former appeal. Briefly stated, the contract recognized that Marnon, plaintiff-respondent, originated an idea for the manufacture of the "Mobile Load-Lift Truck," and that the Vaughan Motor Co., a corporation (hereinafter designated as "Vaughan"), engaged to manufacture said truck in such quantities as the sales thereof by Marnon or others

would warrant. By the terms of the contract, Marnon was given the exclusive sales rights to said truck, no period of time being specified, but the contract was made binding upon the heirs, executors, etc., of the parties. The contract further provided that when said device had been manufactured Vaughan would determine the cost of the device and reserve unto itself a reasonable margin of profit thereon. The parties would thereupon agree and fix a reasonable list or consumers' price "having in mind as part of said cost price and list price a reasonable margin of profit wherein the Party of the Second Part [Marnon] can sell said device at such a profit as the exigencies of the business demand."

The sales part of the contract did not work out as anticipated by the parties, whereupon they verbally modified the same to the extent that instead of receiving a reasonable profit out of his sales, Marnon was to receive an amount equal to eight per cent of Vaughan's sales price on all machines and parts sold. It was incumbent upon Marnon to pay out of his commissions the entire cost of selling, except advertising which was figured at four per cent. This eight per cent arrangement was on a year-to-year basis.

Under this arrangement, in 1939 Marnon went $2,000.00 "in the red." In 1940 he had a net earning of about $3,000.00, and in 1941 a net earning of about $25,000.00.

In January, 1942 Vaughan arbitrarily reduced Marnon's commission to four per cent of the sales, to which reduction Marnon objected and has continued to object up to this time.

Not being satisified with the four per cent reduction in his commission, Marnon filed suit for an ac-

counting covering the years 1942 and 1943 and up to and including April 10, 1944. The trial court held that the parties were engaged in a joint enterprise and awarded Marnon a judgment in the sum of $17,149.00 as the balance due on one-half of the profits for the year 1942, and the further sum of $95,550.00 as the balance due on one-half of the profits for the year 1943. The case was thereupon appealed by Vaughan, and this court, in the previous opinion, reversed the lower court and held that there was no joint enterprise between the parties but did hold that Marnon, under the written contract, was entitled to a reasonable profit on the sale of Mobilifts for the years involved and remanded the case to the lower court for a further hearing to determine what such reasonable profit should be.

Immediately upon the filing of the suit, Vaughan, by written notice, terminated the contract between the parties. When the case went back to the trial court for a further hearing, amended and supplemental pleadings were filed.

It is the position of Marnon that he is entitled to at least eight per cent commission for the years in question, that figure being the arrangement into which the parties had previously entered, and further, that since Vaughan had cancelled the contract without cause, he, Marnon, was entitled to damages for loss of reasonable profits for the ensuing twenty-two years, that being his life expectancy.

It is the contention of Vaughan that Marnon had already been paid a reasonable profit for the years in question, to-wit, four per cent, and for that reason was not entitled to anything further for those years, and further, that since Marnon was unfaithful as an

agent for his principal, Vaughan, in obtaining secret profits as the result of his interest in defendant's Washington agency during the war years, it had the right to terminate and cancel the contract, thereby depriving Marnon of any profits or commissions for the years subsequent to April 10, 1944.

The lower court on the second trial held that Marnon was entitled to nothing further over and above the four per cent paid him for the years in question but held that Vaughan terminated such contract without authority and awarded Marnon a lump judgment in the sum of $250,000.00 for breach of contract. From this sum, it deducted the secret Washington profit, which it was directed to do by this court on the former appeal, which resulted in the final judgment in favor of Marnon against Vaughan in the sum of $116,000.00. From this judgment Vaughan appealed and Marnon cross appealed.

It is agreed by both parties that, this being a court of equity, the matters between the parties should be fully and finally adjudicated and the slate wiped clean. This we will now endeavor to do.

At the outset Vaughan contends that the involved contract is merely a simple, exclusive sales contract which, under the law, gives it the right to terminate the same for unfaithfulness on the part of Marnon, the agent, while Marnon claims that the contract creates an agency coupled with an interest, which, he also asserts, can not be terminated, and that in no event did Vaughan have cause to terminate the same.

■ It was said by the United States Supreme Court in *Taylor v. Burns,* 203 U. S. 120, 51 L. Ed. 116, 27 Sup. Ct. 40, in defining a power coupled with an interest: "By the phrase 'coupled with an interest,' is not meant

an interest in the exercise of the power, but an interest in the property on which the power is to operate."

2. This court has held on two occasions that to create an agency coupled with an interest there must be a present, existing interest in the property constituting the subject matter of the agency. *Sphier v. Michael et al.*, 112 Or. 299, 227 P. 1062, 229 P. 1100; *Scott v. Hall et al.*, 177 Or. 403, 163 P. (2d) 517. In the present case the property constituting the subject matter of the agency is "Mobilifts." By the terms of the contract it is "distinctly understood and agreed between the parties hereto, the said Mobile Load-Lift Truck and the ideas embodied in the manufacture thereof shall be the sole and exclusive property of Party of the First Part [Vaughan] and Party of the First Part shall have the right to patent any ideas contained in said device and all improvements thereon insofar as said device and said improvements shall be patentable and said patents, if any, when so obtained, shall be the sole and exclusive property of the Party of the First Part."

To support his theory that the agency was coupled with an interest, Marnon has cited the following cases: *Sphier v. Michael,* supra; *Scott v. Hall,* supra; *Lane Mortgage Co. v. Crenshaw,* 93 Cal. App. 411, 269 P. 672; *Bowling v. National Convoy & Trucking Co. et al.,* 101 Fla. 634, 135 So. 541; and *State ex rel. Everett, etc., v. Pacific Waxed Paper Co. et al.,* 22 Wash .(2d) 844, 157 P. (2d) 707.

As hereinbefore stated, in the case of *Sphier v. Michael,* supra, and *Scott v. Hall,* supra, the court held that to create an agency coupled with an interest there must be a present, existing interest in the property constituting the subject matter of the agency. In the case

of *Lane Mortgage Co. v. Crenshaw,* supra, the court held that the agent had an interest in the property involved in the way of a 20-year, rent-free lease on the entire second floor of the building. In the case of *State v. Pacific Waxed Paper Co.,* supra, it was held that power giving an irrevocable proxy and the power of attorney to vote stock was intended to be and became security to effectuate the main purpose of the agency.

■ There is a wealth of authority that where an agency or power is given as security it is an agency coupled with an interest and therefore irrevocable. *Scott v. Hall,* supra. See 2 Am. Jur., Agency, 65, § 80, and the cases cited therein.

In the case of *Bowling v. National Convoy & Trucking Co. et al.,* supra, the court held that Bowling had an agency coupled with an interest in that he had conceived and devised a plan of operating the business of transporting automobiles which was to be engaged in by the defendant company. Bowling was made manager and was to supervise and manage the entire business. He was to receive a stipulated compensation, including a percentage of the net income. That case was an appeal from an interlocutory decree denying specific performance on the part of the agent Bowling, and the court held the order not appealable. The court also said that there might be appropriate defenses to such a suit based on the agent's repudiation or nonperformance.

■ All the cases cited by Marnon differ from the case at bar in that they were dealing with the cancellation of contracts by the principal without cause. In the case at bar we have a situation where the agent has been unfaithful to his principal in garnering secret profits, and whether the agency is coupled with an

interest or not would make no difference insofar as the right of the principal to terminate the contracts is concerned. A sound public policy decrees that an agent must be faithful to his trust; and when he is not, we know of no law that would compel the principal to retain the agent in his services. Even where an agency is coupled with an interest, the power and right of the principal to cancel for cause obtains; and if the agent has any redress, it must come from the terms of the contract itself.

A somewhat analogous case is *Michigan Crown Fender Co. v. Welsh,* 211 Mich. 148, 178 N. W. 684, 13 A. L. R. 896. In that case Welsh was employed by the company as its general manager for a period of five years at a monthly salary and was given one thousand shares of the capital stock of the company. It appears that Welsh obtained a secret profit of some $5,000. The company discharged him and brought action for the cancellation of the stock and for an accounting of the secret profit. The court held that the company was entitled to an accounting of the secret profit but that Welsh was entitled to retain the stock, and said:

"Pursuant to this agreement defendant in good faith gave up the position he had, with its larger salary and opportunities, and assumed his duties in plaintiff's service on the date fixed, where he remained for over a year and a half, organizing and managing defendant's business efficiently and successfully until it was developed past the experimental stage and, during his incumbency as manager, experienced a marked growth and prosperity as a manufacturing institution. In that particular it can fairly be said he made good, and accomplished the primary purpose for which his services were secured."

It could reasonably be argued that in that case Welsh's agency was coupled with an interest in that he was given a thousand shares of stock for his services in connection with the company's business, but notwithstanding this the court held the contract to be revocable.

■ Since, under the authorities, Marnon had no interest in the property of Vaughan and, as this court on the former appeal said, had exclusive sales rights as an agent, we hold that such agency was not coupled with an interest as that term is generally understood.

■ It is axiomatic that where an agent secures a secret profit to the detriment of his principal he breaches the contract of employment, and the principal has just cause for terminating the agency.

In the case at bar, on the former appeal, this court held that Marnon violated his obligation to Vaughan, his principal, in securing a secret profit from the Washington agent and required Marnon to account to Vaughan for such secret profit. It appears that when the war occurred, the government, through the efforts of Marnon, took over the Mobilift output of Vaughan. To get the government business, Marnon induced Vaughan to employ a fifteen per cent agent by the name of Cain, who was supposed to have great influence with the "powers that be" in Washington. Marnon had a secret agreement with Cain that the two of them would split the fifteen per cent commission, thereby enabling Marnon to receive a secret profit of seven and one-half per cent over and above the four per cent figure which Vaughan had fixed as Marnon's compensation, which secret profit amounted to $30,649.00 for the year 1942 and $88,146.00 for the year 1943. It is argued, however, by Marnon that when Vaughan terminated the contract it had no knowledge of the Washington secret

profit, and, therefore, could not legally cancel the contract.

We find in Restatement of the Law, Agency, § 112, 292, that: "Unless otherwise agreed, the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal." We find the rule stated in 35 Am. Jur., Master and Servant, § 37, 471, as follows:

"Motive; Knowledge of Justifiable Grounds; Discharge for Causes Other than One Assigned.— If legal grounds for the dismissal of an employee during the term of his employment exists, no importance attaches to the motive which may have actuated the employer in making the dismissal. It is not necessary that an employer, in order to justify a dismissal, show that in dismissing his employee he in fact acted upon some proper ground of dismissal. It is sufficient if a ground of dismissal existed at that time. It is not material whether the employer knew of grounds which in fact existed at the time of discharge; notwithstanding his ignorance, he may avail himself thereof, and in the event of his death, his representative has the same right. Nor is it material that the employer assigned another ground as the cause of the employee's dismissal. The employer may justify a dismissal by relying on a ground different from that assigned at the time of the dismissal."

In the case of *Von Heyne v. Tompkins,* 89 Minn. 77, 93 N. W. 901, the court, in touching on this matter, said:

"Again, the motives which actuate the master in discharging the servant are wholly immaterial, for the act is justified if any legal grounds therefor existed at the time; and it is also immaterial whether the grounds were known to the master,

or not, when discharging the servant. Nor is it necessary for the master to assign a reason for the discharge, and, should he assign one, he is not bound by it; nor is he estopped to rely upon some other or different reason or cause, whether known to him at the time of the discharge or not. Wood on Master & Servant, para. 121; 20 Am. & Eng. Ency. L. (2d Ed.) 33.''

The above rule is recognized in Labatt, Master and Servant (2d Ed.), Vol. 1, § 189, 594; *Farmer v. First Trust Co.*, 246 F. 671; and *Loos v. Geo. Walter Brewing Co.*, 145 Wis. 1, 129 N. W. 645.

■ We hold that Vaughan had a legal right to cancel the contract because of its breach by Marnon in obtaining secret profits out of the Washington deal as aforesaid.

■ Because Vaughan had the authority and right to terminate the contract for cause in the instant case, it does not necessarily follow that Marnon thereby became divested of all of his rights under the contract. On the former appeal a like question was raised by Vaughan wherein it was asserted that Marnon, because of the secret agreement, forfeited all right to recover for services rendered on Vaughan's behalf. The court held this to be the general, but not inflexible, rule, and that on account of Marnon's valuable contribution to the success of Mobilifts during the war years, he should, in the discretion of the court, be entitled to recover reasonable profits for the years involved. In the case of *Michigan Crown Fender Co. v. Welsh,* supra, the court permitted the agent Welsh to retain the stock issued to him because of his valuable idea and services rendered to the company.

■ In the instant case it is obvious that the value of Marnon's idea was measured by the clause in the con-

tract that should he abandon the contract he would be entitled to two per cent of Vaughan's sales price for a period of five years. Although he did not abandon the contract, we hold that the two per cent provision is persuasive as to the proper measure of the value of his idea.

Since Marnon's idea and valuable services rendered to Vaughan were materially responsible for the building up of the Mobilift business from nothing to a very valuable business, we hold that Marnon is entitled to two per cent of Vaughan's sales of Mobilifts for the period of five years from April 10, 1944 to April 10, 1949.

The evidence discloses that Vaughan's sales of Mobilifts for the period beginning April 10, 1944 and ending December 31, 1948 amount to $5,150,269.00. There is no evidence, that we have been able to discover, of what Vaughan's sales amounted to for the three months and ten days in 1949, which go to make up the five years in question. However, by basing the sales for those months on the previous sales by average they would amount to $302,960.57, making a total of $5,453,229.57; two per cent of this amount would be $109,064.59, for which latter sum Marnon should be given credit.

We will now turn to the reasonable value of Marnon's services for the years 1942, 1943 and the portion of 1944 involved. It will be remembered that during the years 1939 to 1941, inclusive, the parties were operating on an eight per cent commission for Marnon based on Vaughan's sales of both Mobilifts and Mobilift parts. (The written contract made no mention of "parts.") Marnon was to pay all expenses of sales, except advertising. The advertising expense assumed by Vaughan

was estimated to be four per cent. On or about January 1, 1942, about the time Marnon's contract was reduced from eight per cent to four per cent, Mr. Boutin, vice president of Vaughan, and the man who conducted most of the business with Marnon, wrote to Marnon as follows:

"In the absence of any special consideration no one is for long going to pay a great deal more to one person for a given commodity when they can or think they can buy the same commodity from someone else. In our particular case, I contend that there is no special consideration and you take the opposite viewpoint. If there is a valid contract in effect then you are right—if there is not, then I am right."

At the trial Boutin testified as follows:

"We couldn't make machines fast enough, so it kind of slowed down his efforts, and he went back and spent a good deal—spent a good deal working the dealers in the middle west himself rather than to have another man in there until such time as we could increase our production and he could get into a new territory and develop it. * * * So Ed went down to Washington and tried to get the machine approved for use by the government depots and was successful in making such arrangements to the extent that the government took most of our production. The thing we anticipated about not getting materials unless selling to the government developed, and if he hadn't made this arrangement in Washington, we would probably have been out of business. That did away with the necessity of paying other men; in fact, he couldn't appoint any other dealers because he couldn't assure giving them any machines. We thought that the original 8% which was supposed to cover the cost of these other men should be reduced, and it was reduced on January 1, 1942."

. It is claimed by Vaughan that on account of the government's having taken over its output in Mobilifts, there was no necessity on the part of Marnon to incur any great expense in the sales of machines. The evidence discloses that Marnon put in a great deal of time and money. On the other hand, Vaughan was saved, by reason of the government's purchase of the Mobilifts, a considerable portion of its advertising expense, which, figured at four per cent, would offset the four per cent contended for by Marnon.

That Marnon was to receive eight per cent of the sales until it was necessary for him to employ other men and that Vaughan was only interested in getting results is evidenced by the following testimony of Boutin:

"Q When you get this 8% commission you say it was—you contemplated that part of it was to be expended for something else?

"A Yes, sir.

"Q Did it make any difference to you or to the Vaughan Motor Company what it was expended for as long as the results were produced?

"A As long as the results were produced and it didn't cost more than 8%. Eight per cent was supposed to be the total cost.

"Q Did the total cost change any up to the time you reduced the percentage?

"A Well, the 8% was the total cost and that is what it was until we changed it to four.

"Q What I am getting at is that I have tried to find out your reason for the reduction.

"A The reason for the reduction was that the 8% was set to provide for payment to salesmen, working the dealers, that Mr. Marnon would establish, and when they couldn't have any dealers there wasn't any need for any men.

"Q But it was all to be made to Mr. Marnon and he was to pay the other men?

"A I don't know whether there was anything definite in that respect or not. In the light of subsequent events I imagine if there had been any other men we would have paid them.

"Q Well, now, at the prior trial of this case, Mr. Boutin, isn't it a fact that you testified that when this 8% was set that you contemplated that he would eventually have to employ block men?

"A That is right.

"Q And that these block men were to be paid out of the 8%?

"A That is right.

"Q But that until such time as block men were necessary, Marnon was to get the entire 8%?

"A Yes.

"Q Was that correct?

"A I think that was the intention at the beginning, that it was going to cost him money to get started, that the whole 8% would go to him.

"Q And that at the time when it was set, you contemplated that all of the 8% was to go to him until such time as other men would be necessary?

"A We didn't figure that was going to be very long.

"Q Well, then, you were only interested in getting results. If he needed other men, he was to pay them out of the 8%?

"A Theoretically, that is probably correct."

The testimony adduced by Vaughan at the trial by leading and reputable businessmen of the city of Portland was confined mostly to what Vaughan's reasonable profit should be in the manufacture of Mobilifts. In our opinion this has very little to do in determining the reasonable value of Marnon's services. The testimony of these men as to what a reasonable profit

would be to exclusive salesmen in businesses other than Vaughan's has very little persuasiveness. The businesses were different and the conditions were not similar. Wentworth, defendants' witness, recognized this distinction in the following testimony:

"Q. What effect would that have on the amount of profit which the person who was connected with the sale of the commodities, what effect would that have on his right to a profit, the fact that products were all sold to the government?

"A  If you are bearing upon this particular case, Mr. Bailey, I don't believe I am qualified to project what—"

A salesman's profits, unless otherwise agreed on, are gauged by his results and, in this case, the volume of his sales. It would not make any difference whether through Marnon's efforts Vaughan sold to one or many customers as long as he obtained satisfactory results. Whether or not Vaughan made any profits was Vaughan's concern and not Marnon's. Vaughan had control of its business and was in a position to make a profit and, according to the evidence, reaped a handsome harvest from Marnon's activities. We read in *Schmalz v. Arnwine,* 118 Or. 300, 246 P. 718, that in determining the reasonable value of a party's services, it is customary to consider, among other things, the profits derived therefrom by the other party. It is another principle of law that where the parties to a contract agree upon a compensation such agreed compensation is considered reasonable. 35 Am. Jur., Master and Servant, § 64, 497, 56 C. J. S., Master and Servant, § 109, 542, *Patton et al. v. Commissioner of Internal Revenue,* 168 F. (2d) 28. If eight per cent was reasonable in 1939 when Marnon went "in the red," in 1940 when his compensation was nominal, and in 1941 when he received a substantial return for his

services, it would occur to us that the same percentage would be reasonable during the years in question when, by reason of his efforts, the government took over most of Vaughan's production, which skyrocketed its sales and its profits to such an extent that in a renegotiation Vaughan was required to refund $375,000.00 to the government.

■ Since Vaughan, through its agent Boutin, was of the opinion that there was no valid contract between the parties, but that if there were a valid contract, then Marnon would be right, and further, that if he thought the agreement between the parties was going to develop into something, Vaughan would not have signed the contract, it is obvious to the court that the reduction from eight per cent to four per cent was made not because Marnon had failed to earn the full eight per cent but because Vaughan thought there was no contract between the parties, and that the eight per cent commission was excessive. It is our opinion that Marnon is entitled to an additional four per cent of the sales price of the Mobilifts for the period in question. During this period, from.the sale of Mobilifts Vaughan received the sum of $3,699,539.00; four per cent of this sum would amount to $147,981.56.

### RECAPITULATION:

Four per cent for the years 1942, 1943
and up to and including April 10,
1944 _____ $147,981.56
Two per cent for five years _____ 109,064.59

Total _____ $257,046.15
Less secret profit _____ 134,000.00

Balance due Marnon _____ $123,046.15

A decree will be entered modifying the decree of the lower court, and Marnon will be awarded a judgment against Vaughan and its successor, Mobilift Corporation, a corporation, in the sum of $123,046.15, all parties to bear their own costs and disbursements.