873 F.2d 717
 CONTINENTAL CABLEVISION OF NEW ENGLAND, INC., Plaintiff-Appellant,
v.
UNITED BROADCASTING COMPANY; Suburban Bank, d/b/a Sovran
Bank/Maryland, as it is Co-Trustee of the
Residuary Trust established under the
Will of Richard Eaton,
Defendants-Appellees,
and
Grover B. Russell, Jr., as he is Co-Trustee of the Residuary
Trust established under the Will of Richard Eaton,
Defendant.
 No. 88-1147.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 12, 1989.
Decided April 27, 1989.
Rehearing and Rehearing In Banc Denied May 25, 1989.
 
 Laura Steinberg (Katherine J. Ross, Sullivan & Worcester, Boston, Mass., John C. Keeney, Jr., Hogan & Hartson, Washington, D.C., on brief), for plaintiff-appellant.
 Marianne K. Renjilian (W. Shepherdson Abell, Jeff Evan Lowinger, Furey, Doolan & Abell, Chevy Chase, Md., Thomas Schattenfield, James H. Hulme, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., on brief), for defendants-appellees.
 Before HALL, PHILLIPS, and MURNAGHAN, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The closing months of 1974 found Continental Cablevision of New England, Inc. and United Cable Company of New Hampshire, Inc. engaged in wide-ranging and expensive litigation involving television franchise rights in Manchester, New Hampshire. The parties, while the litigation was still going on, decided to settle. Continental agreed to terminate the litigation which it had instituted and to concede certain disputed franchise areas to United Cable, in return for $135,000 and a right of first refusal in the event of any attempted direct or indirect transfer of various property assets or the controlling stock interest in United Cable to a third party.
 
 
 2
 United Cable was a wholly-owned subsidiary of Friendly Broadcasting Company, Inc., which in turn was a wholly-owned subsidiary of United Broadcasting Company, Inc., whose sole stockholder was Richard Eaton. In January of 1975, Continental, United Cable, and Eaton (acting as agent for both United Broadcasting and Friendly, as well as United Cable, and in his own right) entered into a written agreement, embodying the terms of settlement.[1] The contract ultimately entered provided as to the right of first refusal, in pertinent part:[2]
 
 
 3
 United hereby grants to Continental a right of first refusal to acquire all or any part of the assets, real or personal, tangible or intangible, including but not limited to all CATV system facilities, house drops and associated equipment of United constituting all or any portion of United's CATV system or systems serving any or all portions of the City of Manchester, New Hampshire (the "System Assets"), and Eaton for himself and as authorized agent for United Broadcasting and Friendly hereby grants to Continental a right of frist (sic) refusal to acquire the shares of stock of United constituting its controlling capital stock interest (the "Control Stock") in each instance before the System Assets or any shares of the Control Stock may, directly or indirectly, be sold or transferred to any third person or persons.[3]
 
 
 4
 Continental subsequently complied with the provisions of the agreement and received payment of $135,000, representing part of the consideration to which it was entitled.[4] The document in final form on January 15, 1975 or January 16, 1975 was sent by Continental from Massachusetts, where it had prepared it, to Eaton in Maryland. It, though dated "as of this 22nd day of January, 1975" (the contemplated settlement date), was still unsigned by either party when sent by Continental to Eaton. On January 17, 1975, Eaton, in Maryland, signed on behalf of himself, United Cable, Friendly Broadcasting, and United Broadcasting, and returned the Settlement Agreement to Continental in Massachusetts, where Continental, upon approval by the board of directors, signed the document on January 20, 1975.
 
 
 5
 A second, conformed copy of the Settlement Agreement, the text of which was in all respects identical with that which had been signed by the parties on January 17, 1975 in Eaton's case and January 20, 1975 in Continental's, was sent to Eaton or his counsel by Continental bearing its signature on January 20, 1975. On receipt thereafter of the conformed copy bearing only Continental's signature, Eaton, who was in Maryland, also signed the document. The date appearing on both the agreement signed January 17, 1975 by Eaton and January 20, 1975 by Continental, and the conformed copy, was "as of" January 22, 1975.
 
 
 6
 In 1981, Eaton died. The trustees of Eaton's estate now seek to sell a controlling stock interest in United Broadcasting to a third party.[5] Continental, arguing that such a move constitutes an indirect transfer of the controlling stock interest of United Cable, brought the present action in the United States District Court for the District of Maryland to enforce its preemptive rights. The district court granted summary judgment to the defendants, finding the right of first refusal in United Cable stock violated the Maryland Rule Against Perpetuities. Continental has appealed.
 
 I.
 
 7
 As a preliminary matter, it has to be resolved, factually, whether a sale of the type contemplated by Eaton's trustees has even vested in possession any right of first refusal which may exist in Continental. Without finding it necessary to decide whether the settlement agreement truly extended to a transfer of a controlling interest in United Broadcasting, the district judge, in a footnote, indicated that he was of the opinion that it would be "illogical" not to consider a transfer of the parent as an indirect transfer of the wholly-owned subsidiary's controlling capital stock interest. We consider the matter as pertinent to our disposition of the case and, hence, one requiring decision. Upon examination of the record, we are convinced that the district court's statement on the matter, while an aside, was a reasoned one, reaching the correct result on the preliminary point involved.[6] The objects which the Settlement Agreement sought to accomplish were as much affected by stock in United Broadcasting which owned, through Friendly Broadcasting, 100% of United Cable, as by stock in United Cable itself.[7] We cannot agree, however, with the ultimate result the district court reached.
 
 
 8
 Construing the Settlement Agreement requires, as an initial inquiry, the determination of which forum's law is applicable. It is well accepted law that a federal court sitting in diversity is required to follow the choice of law rules of the state in which it sits, i.e., in the present case, in Maryland. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The district judge correctly applied Maryland law at the choice of law rules stage and found that, under Maryland law, the place of contracting or locus contractus established what substantive law should apply. Traylor v. Grafton, 273 Md. 649, 657, 332 A.2d 651, 659 (1975); Maryland Casualty Co. v. Armco, Inc., 643 F.Supp. 430, 431 (D.Md.1986), aff'd, 822 F.2d 1348 (4th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988). Specifically, Maryland has defined the locus contractus as the place "where the last act is performed which makes an agreement a binding contract." Grain Dealers Mutual Ins. Co. v. VanBuskirk, 241 Md. 58, 65-66, 215 A.2d 467, 471 (1965).
 
 
 9
 The district court examined the contracting process engaged in by the parties. Having initially sketched out in broad outline the terms of the Settlement Agreement, the parties, negotiating through counsel, proceeded to prepare a document delineating with detail the contours of the right of first refusal. The agreement as so prepared was discussed by the parties who decided that it was accurate and agreeable to both of them in all respects, save for the lack of certain provisions regarding the coverage of direct or indirect actions of Friendly Cablevision and United Broadcasting.[8]
 
 
 10
 Continental's counsel drafted the final version of the Settlement Agreement in Massachusetts, modifying the language to conform to a mutually satisfactory solution for the one item as to which agreement was lacking. Continental sent the new Settlement Agreement, brought to what proved to be final shape in Massachusetts, to Eaton for signature. Continental had not then signed the document. On receiving the unsigned document in Maryland, Eaton signed and either himself forwarded it or had an agent forward it to Continental in Massachusetts. A special meeting of Continental's Board of Directors was convened, at which time the Board voted to enter into the Settlement Agreement and the document was signed on Continental's behalf.
 
 
 11
 Thereupon, Continental, in order to have available a conformed copy which would put an executed version in the hands of both parties, signed a second version and mailed it to Eaton, again in Maryland, who then attached his signature.
 
 
 12
 The district judge ruled that, as to the state whose substantive law should apply, Maryland was the proper state to select, concluding that Maryland was the locus contractus. He reasoned that, although signature by all the contracting parties is the most uniformly regarded satisfactory way to elevate a piece of writing into an agreement, it is not the only way. A settlement agreement, like any other contract, comes into being as soon as an offer and an acceptance, with due consideration, have occurred, regardless of whether subsequent formalities ensue. Baker v. Dawson, 216 Md. 478, 484-85, 141 A.2d 157, 160-61 (1958). Parties could agree upon the terms of a contract to be entered by them and, when a paper writing in exactly satisfactory terms has been finalized, it would become a contract if the parties so intended, even though the signatures of one of the parties, or indeed of all of them, were lacking.
 
 
 13
 The district judge's major principle of law, namely, that, in certain circumstances, signatures are not required to bring a contract into being, was entirely correct. See, e.g., Porter v. General Boiler Casing Co., Inc., 284 Md. 402, 410-11, 396 A.2d 1090, 1095 (1979). His minor premise as to how that principle should be applied in the instant case was, however, slightly flawed.
 
 
 14
 Maryland courts look at the circumstances surrounding contract formation in order to determine whether the parties had entered into a binding oral or informal contract, or intended to enter into a written agreement that would become binding only upon full signature. Eastover Stores, Inc. v. Minnix, 219 Md. 658, 665, 150 A.2d 884, 888 (1959); Peoples Drug Stores, Inc. v. Fenton Realty Corp., 191 Md. 489, 493-94, 62 A.2d 273, 275 (1948). In the present case, there is no evidence that the parties intended to be bound by the unsigned contract; on the other hand, there is adequate indicia they intended the final signed document to be the binding agreement. If both parties only intend to be bound by a signed written instrument, their agreement is not valid, existing and enforceable until each of them has signed it. Peoples Drug Stores, Inc., 191 Md. at 494, 62 A.2d at 275-76. See Binder v. Benson, 225 Md. 456, 462, 171 A.2d 248, 250 (1961); Eastover Stores, Inc. v. Minnix, 219 Md. at 665-66, 150 A.2d at 888. The Restatement of Contracts provides an example:
 
 
 15
 A signs and seals a document containing promises by him and by B and hands it to B for execution. Until B executes it, neither party is bound.
 
 
 16
 Restatement (Second) of Contracts Sec. 105, illustration 1 (1979).
 
 
 17
 Here, the record demonstrates only the final fully executed agreement was intended to be binding. The contract was extensively negotiated and redrafted. The Memorandum of Understanding which was antecedent to the Settlement Agreement recited the parties' intent to "draft and execute a Definitive Agreement" embodying the terms of settlement. (Emphasis supplied). The Settlement Agreement apparently required signatures of all parties, having been constructed with blank lines left for the parties to the contract to sign. The agreement was post-dated as of the day of settlement, further indicating only a fully executed version was intended to represent the binding contract. Moreover, when the Settlement Agreement, signed by Eaton in Maryland but unsigned by Continental, was forwarded after Eaton's signature to Continental in Massachusetts, where it affixed its signature, Continental held a directors meeting to approve the contract, clearly implying that it did not intend to be bound until it signed.
 
 
 18
 Thus, as the contract did not become binding on Eaton until Continental signed it, the choice of Maryland substantive law as the law of the place of contracting appears fallacious. The law of Massachusetts, where the last act necessary to complete the contract was performed, controls.
 
 
 19
 If the proposal is put forth that, not the original executed version, but the second or conformed copy, amounted to the contract on the grounds that it was signed by Continental before being forwarded to Eaton, who executed it in Maryland, an answer amounting to a refutation is simple. Upon joint execution of the original version, a contract existed. The conformed copy only served the purpose of affording Eaton credible evidence that the first version had been signed and was in existence.[9]
 
 II.
 
 20
 Having decided the question of what state's substantive law to apply, we turn to the question on the merits, where we are confronted by the claim of United Broadcasting that the contractual right of first refusal was entirely void because it offended the Rule Against Perpetuities. Massachusetts courts adopt Professor Gray's general formulation of the Rule, finding a property interest void "unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." Certified Corp. v. GTE Products Corp., 392 Mass. 821, 823, 467 N.E.2d 1336, 1338 (1984). See J. Gray, The Rule Against Perpetuities Sec. 201 (4th ed. 1942). That, of course, means either or both a) a life or lives in being or b) twenty-one years. Gray, supra, Sec. 223; Leach & Tudor, The Rule Against Perpetuities Sec. 2414 (1957). See Certified Corp., 392 Mass. at 825-26, 467 N.E.2d at 1339. Massachusetts courts apply the Rule Against Perpetuities as a rule of law, not construction, Springfield Safe Deposit and Trust Co. v. Ireland, 268 Mass. 62, 167 N.E. 261 (1929), applicable to interests in both realty and personalty. Albee v. Carpenter, 66 Mass. 382, 12 Cus.H. 382 (1853).[10]
 
 
 21
 Initially, it is clear that a right of first refusal is a type of option. IV Restatement of Property Sec. 413 Comment (E). An option to purchase property creates a contingent equitable interest in the option holder. Certified Corp., 392 Mass. at 824, 467 N.E.2d at 1338 (1984). Such contingent future interests in property have been found to implicate the provisions of the Rule Against Perpetuities.[11] Certified Corp., supra; see Ferrero Construction Co. v. Dennis Rourke Corp., 311 Md. 560, 565-66, 536 A.2d 1137, 1139-40 (1988) (citing cases). See generally J Gray, The Rule Against Perpetuities, Sec. 330 (4th ed.1942). See also Leach, Perpetuities in A Nutshell, 51 Harv.L.Rev. 638, 660-662 (1938) (criticizing the Rule's applicability to contracts, particularly options).
 
 
 22
 Indisputably, the limit of duration to lives in being plus twenty-one years, requiring the vesting of a contingent interest in that time frame, is not facially met here,[12] at least if the language in which the Settlement Agreement is couched is not approached in terms of what it actually expressed and how an exactly equivalent use of language could be applied in a manner not voiding on Rule Against Perpetuities grounds much of the right of first refusal we have here. The Settlement Agreement purports to confer "a right of first refusal to acquire the shares of stock of United constituting its controlling capital stock interest (the "Control Stock") in each instance before ... any shares of the Control Stock may directly or indirectly be sold or transferred to any third person or persons." As written, the right of first refusal would at first blush appear to be unlimited as to time. See Gray v. Whittemore, 192 Mass. 367, 370, 78 N.E. 422, 425 (1906) (holding a mere possibility that an interest will vest in time is insufficient); Hall v. Hall, 123 Mass. 120, 124 (1877) ("Executory limitations are void unless they take effect ex necessitae and in all possible contingencies" 'within the period of the rule.' ").
 
 
 23
 However, the question of whether and in what manner the Rule Against Perpetuities applies is not devoid of complexity. Consider language (1) conferring a right of first refusal to Continental during the first twenty-one years of the contract's existence,[13] followed by language (2) granting a separate right of first refusal thereafter to Continental.[14] That language says, as a substantial matter, exactly what the Settlement Agreement, in a form of aggregation or shorthand, says. Yet the first grant, which would cover the circumstances at bar, would be valid under the Rule, while the second would be void due to its overly long duration. The question before us is whether this or some other interpretation is available to preserve, at least in some measure, the intent of the original contracting parties from the policy mandate of the Rule.
 
 
 24
 The Rule Against Perpetuities was common law of relatively recent origin, it first beginning to appear in England in the Seventeenth Century. While existence of the doctrine's origins was still comparatively new, Lord Nottingham, to answer a question as to how far the doctrine would reach and what limitations or alterations would apply, provided the impressive, if imprecise, response: "I will stop wherever any visible inconvenience doth appear." Duke of Norfolk's Case, 3 Ch. Cas. 1, 49 (1682).[15] We are called upon in the present case to consider if and to what extent "visible inconvenience doth appear," as well as to if and to what extent it does not, and seek to ascertain the law to achieve a sensible and equitable result.
 
 
 25
 When undertaking to construe and apply the Rule Against Perpetuities, a court will be well-advised to investigate and appreciate the history of the rule and its application. It did not come upon us in customary common law fashion. That is, it did not represent a slow, even microscopic growth analogous to that of a Pacific island erected by accretion of billions of small coral creatures over a substantial period of time. Rather, the Rule Against Perpetuities grew by leaps and bounds, rather like the piling up of immense blocks of limestone, constituting (in some minds apparently) a common law temple, suddenly locked in place.[16] See generally Gray, supra Secs. 153-170.
 
 
 26
 [T]he public welfare was threatened by the desires of the great families to parcel out the soil of England among them and impose upon it the dead-hand control of perpetual family settlements. Two centuries earlier the courts had nullified the Statute De Donis by permitting disentailment, and these judges did not now propose to allow the innovations of the Statute of Uses to create new "perpetuities." The threat was real. A firmly restrictive rule was called for.
 
 
 27
 Leach, Perpetuities in Perspective, 65 Harv.L.Rev. 725-26 (1952).
 
 
 28
 As may be expected with newly fashioned doctrine abruptly superimposed on the common law landscape, its use has led to some strange anomalies. It is true that Lord Nottingham, in announcing the principal culminating factor in the invention of the Rule Against Perpetuities, provided some apparent flexibility when he limited a contingency only to "visible inconvenience". See Duke of Norfolk's Case, supra. The predicted flexibility, even in the case of transfers not donative in nature, however, has to a substantial extent been unrealized.
 
 
 29
 As the rule has been applied since it saw, in developed form, the light of day in the 1680's, it more often than not has led to a frustration of the parties' interests, although a small alteration, of form merely, not of substance, would not disturb the objectives of the rule and would succeed much more completely in meeting the parties' intent. It is true, nevertheless, that there have been sometimes successful attempts to meet the case with an appropriate modification which is insubstantial in effect; if not to the rule, then to the proper interpretation of the grant or transfer to which the rule is to be applied. That is what happens when infinity is not treated in a summary, short-hand fashion but is divided into its component parts, i.e., for example, twenty-one years, plus infinity thereafter. Common law lawyers have not entirely forsworn the techniques of purely formal adjustments to accomplish increased fairness. Rather as to such moderations lawyers have grown accustomed to live with them. As the Restatement notes: "It is ... necessary to keep in mind that the rule against perpetuities is subject to judicial growth and change to reflect current policy considerations." Restatement (Second) of Property, Pt. 1, at 11. Massachusetts has on occasion displayed some flexibility. Thus, rather than invalidating an overly long power of appointment from its inception,
 
 
 30
 "as applied to the exercise of a power of appointment the words of the rule are satisfied if it appears that in the light of facts as to relationship and longevity existent when the appointment is exercised, the estates created in truth will vest and take effect within the period limited by the rule, although this may not have been certain at the death of the donor of the power."
 
 
 31
 Minot v. Paine, 230 Mass. 514, 522, 120 N.E. 167, 170 (1918). Accord Sears v. Coolidge, 329 Mass. 340, 108 N.E.2d 563 (1952); Fiduciary Trust Co. v. Mishou, 321 Mass. 615, 75 N.E.2d 3 (1947), overruled on other grounds, Powers v. Wilkinson, 399 Mass. 650, 506 N.E.2d 842 (1987).
 
 
 32
 Elsewhere, unvested contingencies, on occasion, have been treated as divisible so that the part of an interest that must vest in time will be upheld and only the more remote portion voided. For instance, where a gift is made upon either of two expressed contingencies, one being remote and one not, the gift takes effect if the valid contingency occurs. Gray v. Whittemore, 192 Mass. 367, 78 N.E. 422 (1906). See Leach, Perpetuities in a Nutshell, 51 Harv.L.Rev. at 654.[17]
 
 
 33
 It has been recognized that a grant may be severable in determining whether part of it may be saved and only the other part be held void. See, e.g., Coelenbier v. DeSommery, [1912] 2 Ch. 622 (where testamentary power was held to be divisible into two distinct powers, one of which was open to objection because of the Rule Against Perpetuities, the court merely avoided that power and gave effect to the power which was not open to objection); Attenborough v. Attenborough, (1855) 1 K & J 296.[18]
 
 
 34
 Likewise, a gift to a class, of which some future members may implicate the Rule, has been divided into separate gifts, one good, the other bad. For example, in Re Estate of Birkner, 90 N.J.Super. 91, 216 A.2d 258 (1966), a disposition of annuities to grandchildren who survived the testatrix was held valid with respect to those living at her death, but invalid with respect to unborn grandchildren. To the same effect, in Herbert v. Webster, (1880) 15 Ch.D. 610, a sum was settled in trust for present and future children in equal shares, with a restraint on anticipation of the daughters' shares and some daughters were in esse at the time the trust came into being while others were not; in such a case, to carry out the settlor's intention and to avoid the Rule Against Perpetuities, the gift was read as of the shares separately, thus validating the shares of the daughters who were already alive when the trust was settled. In re Ferneley's Trust, [1902] 1 Ch. 543, held that a restraint on anticipation imposed by a general clause in a will upon all the shares of daughters of testator's children is good as to the shares of those members of the class who were born in testator's life, though void as to the shares of those born afterwards. Accord Garne v. Tennent, [1907] 1 Ch. 276. Other courts, too, have on occasion crafted an exception, when it would not disturb a testamentary scheme, to the usual rule of "all or nothing" and divided a gift so as to save those shares within the period permitted by the rule. See, e.g., Shepard v. Union & New Haven Trust Co., 106 Conn. 627, 138 A. 809 (1927); Ryan v. Ward, 192 Md. 342, 64 A.2d 258 (1949).
 
 
 35
 However, such slight modification or clarification in the language to which the Rule Against Perpetuities applies will not justify a radical alteration in the Rule itself. An effort fails if it seeks to accomplish too great a change. See generally Ferrero, supra, 311 Md. at 567, 536 A.2d at 1140. Therefore, a wholesale disregarding of the rule on the grounds that interests other than real property interests are involved has not succeeded. See, e.g., Ramage v. First Farmers & Merchant's National Bank, 249 Ala. 240, 30 So.2d 706 (1947). Similarly, efforts to take interests created by contract, especially contracts commercial in character, totally out of the rule, have failed. See generally Leach, Perpetuities in Perspective: Ending the Rule's Reign of Terror, 65 Harv.L.Rev. 721, 737-38, 748 (1982). Yet efforts small in scope, making more specific the terms rather than altering the meaning of a transfer, to achieve escape from the rule in a particular case have on occasion been successful. See, e.g., Sears v. Coolidge, 329 Mass. at 346, 108 N.E.2d at 567 (in upholding a trust arrangement reserving a power of appointment to the settlor, which was otherwise void under the rule, the court looked to the circumstances at the death of the settlor, rather than at the execution of the deed, deeming it "wise not to apply unmodified a remorseless technical principle to a case which it did not fit"); Minot, supra. See also Franklin v. Spadafora, 388 Mass. 764, 768, 447 N.E.2d 1244, 1247 (1983) (in measuring in Rule Against Perpetuities terms the durational validity on restraints on alienation grounds of a bylaw restricting the number of condominium units that could be owned by any one party, the court "decline[d] to apply the Rule [Against Perpetuities] to a form of property ownership" unknown at common law); Borland's Trustee v. Steel Brothers & Co. Ltd., [1901] 1 Ch. 279.[19]
 
 
 36
 Returning to our suggested division into two rights of first refusal, one limited in duration to twenty-one years and another applying at all times thereafter, the approach is supported by the consideration of no little moment that a contract providing exactly the same things as the Settlement Agreement ordains would read:
 
 
 37
 1) a right of first refusal to Continental during the first 21 years of the contract's existence; followed by
 
 
 38
 2) a right of first refusal to Continental indefinitely thereafter.
 
 
 39
 Only 2) should be voided while 1) should remain vested from the outset if viewed from the holder's, i.e., Continental's, point of view, or at least will vest if at all within twenty-one years of its creation so far as the would-be seller, that is United or United Broadcasting, is concerned.[20] See Springfield Safe Deposit & Trust Co., supra, 268 Mass. at 67-68, 167 N.E. at 263 (if two alternative contingencies are proved and only one is valid, under the Rule, the grant is still effective on the happening of the valid contingency). Accord Sears, supra. See also Gray v. Whittemore, supra. The twenty-one year contingency would not, in any event, be visibly (or, for that matter, invisibly) inconvenient in duration, and hence it is valid.
 
 
 40
 It would seem apropos at some point to consider, even if only by the way, the question of the parties' intent in including the right of first refusal in the Settlement Agreement. The intent behind that portion of the document is not searchingly addressed in the briefs or record. Nevertheless, it is safe to assume that Eaton and United Broadcasting expected possibly to have to part with something of substance. If they were agreeing to the terms of the Settlement Agreement in the expectation that one significant portion, the language creating the right of first refusal, would be voided in its entirety on Rule Against Perpetuities grounds, a serious question would arise as to whether there has been a knowing misrepresentation by Eaton and United Broadcasting of a presently existing intent when the Settlement Agreement was entered. The statute of limitations might have been tolled in such a case, so far as a tort action for fraud is concerned, until the first assertion of the Rule Against Perpetuities has occurred. Brodeur v. American Rexoil Heating Fuel Co., Inc., 13 Mass.App. 939, 430 N.E.2d 1243, 1245 (1982); Frank Cooke, Inc. v. Horwitz, 10 Mass.App. 99, 406 N.E.2d 678, 683 (1980). Continental, presumably with reason, regards United Cable as worth more to it than the price it will have to pay under the right of first refusal.
 
 
 41
 Conversely, it stretches the imagination beyond limit to accept that Continental knowingly and intentionally took the risk that Eaton and his corporations could be expected to regard themselves as bound to give effect indefinitely--for perhaps thousands of years--to the right of first refusal. Such an unquestioning acceptance of so unwieldy a burden by Eaton and United Cable, with the Rule Against Perpetuities looming broodingly in the background, is virtually impossible to assume. It is much more realistic to conclude that Continental realized that the termination of the right of first refusal would have to occur at some reasonable time. In the absence of any specific delineation of the right's life span, the life expectancy of twenty-one years best accords with the facts presented by this case and by pertinent law.
 
 
 42
 Having proceeded thus far on the question of the parties' intent as to duration of the right of first refusal, it would appear that what the Settlement Agreement provides, perhaps insofar as strict linguistic accuracy is concerned, but not in terms of reality, if severability is considered, is "always" so far as Continental has read the Settlement Agreement, "never" for Eaton, his wholly owned corporations, and their successors. Neither is a satisfactory answer, and that suggests a more agreeable response in the absence of viable alternatives, namely: a "reasonable" time, not to exceed the period prescribed by the rule. See Childs v. Sherman, 351 Mass. 450, 455-56, 221 N.E.2d 748, 751 (1966); Yentile v. Howland, 26 Mass.App. 214, 525 N.E.2d 689, 691 (1988).
 
 
 43
 We recognize that by pursuing the route of the parties' intent we have, thus far, only touched on the possible maximum allowable limit of duration (twenty-one years), not on what was actually the product of a meeting of minds. The parties did not have the foresight to include a savings clause, see Boston Safe Deposit & Trust Co. v. Collier, 222 Mass. 390, 111 N.E. 163 (1916), or other indicia of their intent. In some circumstances, that would suggest a remand for a determination of a reasonable length of time, either twenty-one years or such lesser period as appears to have been mutually intended, the life of Eaton say, or a duration of no more than ten years. That might bring victory to United Broadcasting, depending on when it might be determined by the factfinder that the right of first refusal was first activated. Or it might be seventeen years or more, in which case the victory would redound to the benefit of Continental.
 
 
 44
 Two obstacles to the calling for a remand loom up. First, the parties have not phrased arguments along such a line, United Broadcasting steadfastly having contended that the right of first refusal was void from the outset and Continental having appeared to press for eternity. Second, the record affords no sufficient evidence of what would be a reasonable duration for the right of first refusal.
 
 
 45
 Bearing in mind the extensive amount of court time already expended, and the capabilities of counsel on both sides without the subject coming up, we conclude that twenty-one years, i.e., to a date in 1996, is the correct and reasonable maximum length of life for the right of first refusal. Of course, the attempt at a sale of control has shortened the actual period. No loaf at all, for which United Broadcasting has striven, is less satisfactory an answer than half-a-loaf, the historically acceptable twenty-one years, with which Continental must now be satisfied.
 
 
 46
 The solution, under Massachusetts law, of a twenty-one year duration for the life of the right of first refusal avoids impenetrable uncertainty, does no violence to the intent of the parties, and further renders it unnecessary for us to wrestle with the question of whether Massachusetts and Maryland law would each decree that here we have a vested interest, the right, in a contingent interest, the first refusal. If so, we would have to address the question of whether the right of first refusal is, therefore, wholly, or sufficiently for Continental's purposes, valid on those grounds. See Putnam v. Story, 132 Mass. 205, 211 (1882) (speaking of a "vested interest in a contingent remainder"); In re Banks' Will, 87 Md. 425, 443, 40 A. 268, 274 (1898) ("[T]here is a wide difference between a vested interest in a contingent remainder, which is an existing estate, and a contingent interest") (emphasis in original); accord Reilly v. Mackenzie, 151 Md. 216, 221-22, 134 A. 502, 505 (1926).[21] After all, the rule only invalidates interests which vest too remotely; not those that merely last too long. Seaver v. Fitzgerald, 141 Mass. 401, 6 N.E. 73 (1881); Ferrero, supra, 311 Md. at 572-73, 536 A.2d at 1142. Cf. Proprietors of Church v. Grant, 69 Mass. 142, 33 Gray 142 (1855) (Rule applies even when there is no tying up of property interests or restraint on alienation).
 
 
 47
 While that might spare our having to decide the initial question of whether Massachusetts or Maryland substantive law applies, we have, indeed, concluded that Massachusetts substantive law controls. We have further, then, decided that, applying Massachusetts law, there is here a valid right of first refusal since it must vest, if at all, within twenty-one years.
 
 
 48
 The possibility that the spectre of a restraint on alienation might be adverted to with regard to the interest for the first twenty-one years need not long detain us. The contention conceivably could arise since sale to anyone other than Continental will have been foreclosed so long as Continental has expressed an intent to exercise the right of first refusal. See Ferrero Construction Co., supra. See also Certified Corp., supra, 392 Mass. at 825, 467 N.E.2d at 1339 (an option to purchase " 'imposes an immediate restraint upon alienation of the owner' of the property for the period during which the option may be exercised") (quoting Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 153, 128 N.E. 177, 182-83 (1920)). Massachusetts courts, utilizing the term of the Rule Against Perpetuities as a durational yardstick, have construed such restraints upon alienation in a flexible manner, so as not to invalidate private contracts and transactions on technical grounds. See, e.g., Franklin, supra (durational validity of restraint on alienation not gauged by normal measure of Rule Against Perpetuities, where property is of type unknown to common law); Sears, supra (refusing to apply "unmodified" the rule "to a case which it did not fit"). As long as the duration is confined to a reasonable time, i.e., within the period of the rule, cf. Roberts v. Jones, 307 Mass. 504, 30 N.E.2d 392 (1940) (holding restraint on alienation whose duration was longer than period of the Rule unreasonable), we have here no restraint on alienation which should be legally cognizable as such, for the owner whose stock is subject to it remains essentially free to sell at a satisfactory price if a genuine would-be buyer can be found. See New England Trust Co. v. Abbott, 162 Mass. 148, 38 N.E. 432 (1884); Metropolitan Transportation Authority v. Bruken Realty Corp., 67 N.Y.2d 156, 501 N.Y.S.2d 306, 492 N.E.2d 379 (1986). Cf. Ferrero, supra. The right to exercise a whim as to which buyer to prefer, when the price is exactly the same whoever purchases, whatever the effect to be given to such a right of unreasonably long duration, is not an object the rule forbidding restraints upon alienation is designed to protect where its duration is but for at most twenty-one years and commercial property such as television company franchise stock is what is subject to the right.[22]
 
 
 49
 Inherent policy concerns also militate against finding the subject provision completely void on perpetuities grounds. The Rule Against Perpetuities, as it first arose, was a rule addressed to conveyancing in the situation of donative property right settlements not usually or in a traditional manner concerned with commercial considerations. See Childs, supra, 351 Mass. at 455-56, 221 N.E.2d at 751 (1966).[23] It is true that the doctrine first arose with respect to interests in real property, and contentions of non-applicability of the Rule Against Perpetuities in other than real property situations have been made in some cases with some limited success. E.g., Borland's Trustee v. Steel Brothers & Co. Ltd., [1901] 1 Ch. 279; South Eastern Ry. Co. v. Associated Portland Cement Manufacturers (1900) Ltd., [1910] 1 Ch. 12. See London & Southwest Ry. Co. v. Gomm, (1882) 20 Ch.D. 562, 580 ("If it is a bare or mere personal contract it is of course not obnoxious to the rule"); Eastman Marble Co., 236 Mass. at 152, 128 N.E. at 182 ("The contract in the case at bar is not a mere option to purchase. If the contract had been a simple personal agreement of that sort, it would have given ... to the plaintiff no interest in the property." (citation omitted)). Nevertheless, contentions that commercial transactions or actions involving interests in personal property should be exempt from the Rule Against Perpetuities, in a general, unfettered way, have been unsuccessful in Massachusetts. See Fiduciary Trust Co. v. Mishou, supra (personal property); Certified Corp., supra (commercial transaction). Cf. Mass.Gen.L. ch. 184A, Sec. 1. Yet Massachusetts courts have, on specific occasions, narrowly construed questionable provisions or liberally implied durational limitations to avoid harsh inequities caused by unrelenting application of the rule and a consequential defeat of the grantor's or the contracting parties' intention. See, e.g., Childs, supra; Yentile, supra; Brandenburg v. Thorndike, 139 Mass. 102, 28 N.E. 575 (1885).[24]
 
 
 50
 Certainly it appears evident that for unreasonable restraint on alienation reasons as well as on Rule Against Perpetuities grounds, a right of first refusal could not properly extend for hundreds, indeed theoretically even thousands, of years. The authorities are sparse as to whether a right of first refusal as to the sale of stock must indeed comply with a rule concerning durational restraints upon alienation. We feel it probably must in some respects. Cf. Ferrero Construction Co., supra. See Certified Corp., supra, 392 Mass. at 825-26, 467 N.E.2d at 1339. However, for what would be a reasonable period of duration, i.e., twenty-one years, a visible inconvenience doth not materialize. Indeed a grant for all of the twenty-one years following the life of Eaton, would not seem unreasonable, but we do not need to decide precisely that question. Here, the right of first refusal has vested within fifteen years. In fashioning of the law of the Rule Against Perpetuities for commercial transactions of the kind here involved, to require a modification from the somewhat unnecessarily all embracing, intention frustrating wooden disregard of the testator's or settlor's intent which applies when land transactions of a non-commercial kind are concerned, would appear to be appropriate.[25] We, however, only read language in line with its true intent, applying the Rule in its altogether rigorous form to the language thus determined.
 
 
 51
 It is our judgment that the contention of United Broadcasting that the right of first refusal should be struck down in its entirety unnecessarily reaches a result visibly inconvenient and one never contemplated by those active in creating the Rule Against Perpetuities and in its evolution. Business is an unlikely place to encounter an "unborn widow" or a "fertile octogenarian." See Leach, Perpetuities in a Nutshell, 51 Harv.L.Rev. at 638 (the period of a life in being and 21 years thereafter has no significance in the world of commercial affairs).
 
 
 52
 We cannot overlook that Continental has, upon entering the Settlement Agreement, terminated litigation which must have been of considerable potential value. The right of first refusal received substantial attention from both parties in negotiating and drafting the agreement. The record indicates that it formed a major part of the consideration Continental received in return for foregoing its potentially meritorious legal claims for already in excess of fourteen years. Continental would, to date, lose, in large measure, the benefit of its bargain. We would be confronted with difficult questions of unjust enrichment and how to value and otherwise deal with it were we to determine that the right of first refusal was in its entirety from the outset null and void. We, to the contrary, regard it as a simpler and fairer solution to uphold the right of first refusal for the fixed period named in the Rule Against Perpetuities, namely, twenty-one years. That is an approach much more in accord with the parties' intention and free of any complaint that it prevents vesting for an unreasonable period of time.
 
 
 53
 Consequently, we reverse and remand, ordering the district court to implement this opinion in a manner consistent herewith.
 
 
 54
 REVERSED AND REMANDED.
 
 K.K. HALL, Circuit Judge, concurring:
 
 55
 I fully concur with the result reached by the majority and in large part with the analyses employed by Judge Murnaghan in his fine opinion. I write separately only to clarify what I believe is dispositive to the Rule Against Perpetuities ("RAP") issue.
 
 
 56
 In my view, the majority properly states the RAP as it is formulated in Massachusetts and properly concludes that the Massachusetts courts would apply the RAP to the right of first refusal held by Continental. I also agree that the plain language creating the right violates the RAP.
 
 
 57
 From this point, I am concerned that the majority's analysis, although essentially correct, becomes somewhat unclear. The Massachusetts courts have repeatedly expressed their reluctance to mercilessly apply the RAP in a way that works a commercial injustice. See Childs v. Sherman, 351 Mass. 450, 221 N.E.2d 748, 751 (1966); Yentile v. Howland, 26 Mass.App.Ct. 214, 525 N.E.2d 689, 691 (1988). This concern is paramount in this case. If United Broadcasting were now, through the RAP, allowed to negate the right of first refusal which was the primary concession it made in settling its previous litigation with Continental, it would be unjustly enriched in a way that these two sophisticated corporate entities never envisioned. In such a situation the Massachusetts courts would apply the RAP "reasonably, in light of its objectives and the economic conditions of modern society." Childs, 221 N.E.2d at 751. To prevent this windfall to United Broadcasting, the Massachusetts courts would view this right of first refusal as viable as long as it vests within "a reasonable period of time" not to exceed the period of the RAP. Id. That is exactly the result this Court reaches today. Our holding does nothing more.
 
 
 58
 The majority discusses a wide range of RAP-saving techniques and toys with the notion of "interpreting" the right of first refusal to in actuality be two rights of first refusal: (1) a contingent right existing the first 21 years of the contract; and (2) a contingent right existing for an indefinite time thereafter. Such an interpretation would certainly be creative, but just as certainly would be unsupported by the law of Massachusetts, the law which necessarily controls our decision. My reading of the majority opinion, however, leads me to conclude that this rationale is not the one finally relied upon to decide this case. At 727. Rather, we hold only that Continental's right of first refusal will last for "a reasonable time," in this instance, 21 years. Id. at 727. Because Continental's right has been exercised within this period, it does not violate the RAP. It is with this understanding that I concur in the majority opinion.
 
 
 
 [1]
 Early drafts of the agreement referred to Eaton as the sole stockholder of United Cable. Continental subsequently discovered the true corporate structure, and the agreement was then amended and, as so amended, constituted the final version
 
 
 [2]
 The provisions as to the right of first refusal formed a major part of the written agreement
 
 
 [3]
 The agreement also provided in part:
 (6) Said right of first refusal shall not apply to any transfer, assignment, devise or gift of the said System Assets or the Control Stock either directly or in trust, by Mr. Richard Eaton, either directly or through United Broadcasting or Friendly, to any of his natural or adopted children, his wife or his stepchildren, nor shall a bequest under the will of Mr. Eaton be considered a transfer to a third person or persons. Said right of frist (sic) refusal shall also not apply to any transfer, assignment, or gift of the Control Stock either directly or indirectly from the present stockholder of record to Eaton individually or to a corporation whose stock is owned 100% by Eaton. However, any such assignee, transferee, devisee, or beneficiary of Mr. Eaton, United Broadcasting or Friendly, shall take the System Assets and Control Stock subject to Continental's right of first refusal hereunder and such right of first refusal shall be applicable to any proposed sale or transfer of the System Assets or Control Stock to any third person or persons by any such assignee, transferee, devisee, or beneficiary of Mr. Eaton, United Broadcasting or Friendly, or any transferee of them who was not a third person for the reasons stated therein.
 
 
 [4]
 The remaining consideration bargained for was the right of first refusal
 
 
 [5]
 After oral argument in this case, a binding contract, subject, however, to rights, if any, of Continental under the right of first refusal, was entered into for the sale of the controlling stock interest in United Broadcasting, thus removing from our consideration the issue of whether Continental's right of first refusal, if validated and potentially implicated, had matured. Thus, any such maturity occurred no later than fourteen years and a few months after the Settlement Agreement came into existence
 
 
 [6]
 The Settlement Agreement subjected to the right of first refusal any "assignee, transferee, devisee or beneficiary of Mr. Eaton, United Broadcasting or Friendly." (Emphasis supplied)
 
 
 [7]
 Indeed, the circumstances surrounding the negotiation and drafting of the settlement agreement, as discussed below, indicate a specific intent to bind the entire "United" corporate structure, to ensure that any transfer of control from Eaton would implicate Continental's preemptive rights. Cf. Engel v. Teleprompter Corp., 703 F.2d 127, 134 (5th Cir.1983) (finding the transfer of stock of parent corporation does not affect ownership of assets held by subsidiary, where "absolutely no circumstances, factual, legal or equitable would require us to disregard the separate legal existence of the two subsidiaries in question")
 
 
 [8]
 See note 1, supra
 
 
 [9]
 Alternatively, if the fact that the writing, before signature by any party, had been reduced to the form all parties had agreed would bind them, so that neither Eaton's signature nor the signature of Continental was required to bring about a contract, we would still have to identify the last act necessary to bring about completion. That would also make Massachusetts the state to refer to for ascertainment of substantive law, even taking the approach of the district judge, since it was there that the contract was placed in final form
 Preoccupation with Statute of Frauds restrictions on enforceability as against a party who or which has not yet signed should not obscure the fact that it is the existence of a binding contract, not its subsequent enforceability, which concerns us. In Statute of Frauds situations, it is commonplace for an oral contract to exist which is denied enforcement because not in writing, at least until the non-signing party thereto by testimony or performance admits the contract's existence. See Restatement (Second) of Contracts Sec. 193(3); U.C.C. Sec. 2-201(3)(b). Likewise, a plethora of signatures will not save a document which is not otherwise a contract.
 Here, the contract was a bilateral one and possessed the customary trait of mutuality. Eaton could not be "bound" to a contract which did not yet exist. So "binding," in a Statute of Frauds sense, only occurred as to all parties when Continental signed in Massachusetts.
 
 
 [10]
 Although there are specific exceptions to the common law rule, none is relevant here. See C. Simes & A. Smith, Future Interests Sec. 1288 (2d Ed.1956). Nor does Continental's predicament fall within the provisions of Mass.Gen.L. ch. 184A, which modifies the rule so as to determine the validity of future interests at the termination of the applicable life estates or lives in being. The statute does not affect options to purchase. See Certified Corp., supra; Leach, Perpetuities Legislation, Massachusetts Style, 67 Harv.L.Rev. 1349 (1954)
 
 
 [11]
 Of all options, a right of first refusal is one of the least obnoxious to the policy concerns of the rule. Cf. Iglehart v. Phillips, 383 So.2d 610 (Fla.1980). A majority of jurisdictions, however, recognize that a right of first refusal is subject to the Rule Against Perpetuities, see Ferrero Construction Co. v. Dennis Rourke Corp., 311 Md. 560, 565-67, 536 A.2d 1137, 1139-40 (1988) (citing cases and authorities), though there is contrary authority. E.g., Cambridge Co. v. East Slope Investment Corp., 700 P.2d 537, 542 (Colo.1985); Metropolitan Transp. Auth. v. Bruken Realty Corp., 67 N.Y.2d 156, 492 N.E.2d 379, 384, 501 N.Y.S.2d 306, 311 (1984). See Ferrero, 311 Md. at 568-69, 536 A.2d at 1141 (citing cases). A few courts have specifically exempted stock options from the Rule's ambit. See Kingston v. Home Life Ins. Co., 11 Del.Ch. 258, 101 A. 898 (1917), aff'd, 11 Del.Ch. 928, 104 A. 25 (1918); State ex rel Everett Trust & Saving Bank v. Pacific Waxed Paper Co., 22 Wash.2d 844, 157 P.2d 707 (1945). English courts have generally construed options as subject to the Rule, London & S.W. Rwy v. Gomm, (1882) 20 Ch.D. 562, including rights of first refusal. Woodall v. Clifton [1905] 2 Ch. 257, aff'd, [1905] 2 Ch. 266 C.A.; Manchester Ship Canal Co. v. Manchester Race Course Co. [1900] 2 Ch. 352, aff'd, [1901] 2 Ch. 37, C.A
 Massachusetts has not specifically addressed rights of first refusal; nonetheless, we consider the majority view, expounded recently and eloquently by the Maryland Court of Appeals in Ferrero, 311 Md. at 564-75, 536 A.2d at 1139-44, to be persuasive and in accordance with other Massachusetts pronouncements on the Rule. We thus proceed on the assumption that Massachusetts would adopt the majority view and, on principle, find preemptive rights subject to the Rule.
 
 
 [12]
 The interest, upon creation, would not vest until there has been an attempt to sell the Control Stock of United Cable to a third party. There is no stated limitation as to duration of the right
 
 
 [13]
 Or consider a number of grants, each of one year, for a total of 21 years
 
 
 [14]
 If the Settlement Agreement had additionally specified Eaton as a life-in-being no doubt six more years, the time from entry into being of the Settlement Agreement until his death, could have been added, but it is not necessary to become embroiled in that tangled web. The right of first refusal clearly has matured well within 21 years of the Settlement Agreement having come into present maturity through the attempts of Eaton's trustees to sell in less than 15 years. With no lives-in-being identified as such in the Settlement Agreement, or readily deducible therefrom, it may be improper for us to recast the contract for the parties to name them. Certified Corp., 392 Mass. at 825-26, 467 N.E.2d at 1339. Cf. B.M.C. Durfee Trust Co. v. Taylor, 325 Mass. 201, 89 N.E.2d 777 (1950) (measuring lives need not be specifically designated in the instrument). See generally Restatement (Second) of Property, Donative Transfers, Sec. 13 (1983). Furthermore, it would be unwise to grant to members of a court a broad power to name lives-in-being otherwise not mentioned or implicated as such, because of the difficulties which might then descend upon us which are recognized to exist when duration of an interest is limited, for example, to the lives of all descendants of Queen Victoria currently alive, as the "lives in being." See Leach, Perpetuities In a Nutshell, 51 Harv.L.R. 638, 642 (1938). Compare In Re Villar, 1 Ch. 243 (1929), with State v. McGee, 200 Iowa 329, 204 N.W. 408 (1925). Cf. Kentucky Rev.Stat. Sec. 381.216 (1972) (requiring measuring lives to "have a causal relationship to the vesting or failure of the interest")
 
 
 [15]
 Though subsequently reversed in 1 Vern. 163, the opinion was reinstated in 14 Lords Journals 49, H.L. (1685)
 The Rule's various permutations were set into stone over the next century and a half, finally enshrined in present form in Cadell v. Palmer, 1 Cl. & Fin. 372 (H.L. 1833).
 
 
 [16]
 A temple at whose altar, we may add, the good faith intentions of untold numbers of unwary grantors have been sacrificed
 
 
 [17]
 See id. at 658, 506 N.E.2d 842:
 But in the United States we have a precedent which is lacking in England. It has become well settled that, in the construction of a statute, that interpretation will be selected which renders the statute constitutional rather than unconstitutional, even to the extent of a warping of words which cannot be described otherwise than as violent. The rationale of this rule is directly applicable to the construction of wills and trusts under the Rule against Perpetuities. One starts with the inference that the testator (like Congress) intended to do a legal act rather than an illegal one, and one permits this basic intention to overcome inferences as to minor intentions, which would ordinarily be drawn from particular words, unless those words are clear. Such an attitude seems increasingly to represent the trend of American authority.
 
 
 [18]
 In more recent times England, though perhaps closer to the hallowed traditions of the common law, has found no difficulty in enacting various statutory modifications to the Rule's relentless mandate. See, e.g., Perpetuities and Accumulations Act, 1964, c.55, Sec. 1 (which, inter alia, restricts options in gross to 21 years); Law of Property Act, 1925, 15 Geo. 5, c.20 Sec. 163. The earlier attempts of the English common law courts to grapple with the Rule, noted here and infra, are highly instructive for our purposes
 
 
 [19]
 For example, in Stocker v. Dean, 16 Beau. 161, 51 E.R. 739 (1852), the Court cut down a right of preemption purportedly valid "at all times thereafter" and hence too remote, to the life of the owner of the property and, therefore, valid. Similarly, in Carter v. Berry, 243 Miss. 321, 136 So.2d 871, modified, 243 Miss. 356, 140 So.2d 843 (1962), the court validated a gift to grandchildren "now or hereafter born" contingent on the youngest attaining twenty-five by cutting back the age contingency to twenty-one
 Of course, the most practical and far-reaching of modern innovations is the so-called "second look" or "wait-and-see" doctrine, which enables a court to examine retrospectively, as in the case here, the events following a document's execution to determine if the contingent future interests, while in theory they could be remote, did, in fact, vest in time. See, e.g., Phelps v. Shropshire, 254 Miss. 777, 183 So.2d 158 (1966); Merchants Nat. Bank v. Curtis, 98 N.H. 225, 97 A.2d 207 (1953); Story v. First Nat. Bank & Trust Co., 115 Fla. 436, 156 So. 101 (1934). While admittedly the minority view, the wait-and-see doctrine has been adopted by the Restatement (Second) of Property, Donative Transfers, at Sec. 1.4. See also Simes, Is the Rule Against Perpetuities Doomed?, 52 Mich.L.Rev. 179 (1953) (criticizing the wait-and-see doctrine); Leach, Perpetuities: The Nutshell Revisited, 78 Harv.L.Rev. 973, 992 (1965) (reserving term "second look" for circumstances similar to Sears, supra, involving a power of appointment, revocation or amendment, where the facts existing at the time the power is exercised or expires can be taken into account, even though the period of perpetuities runs from the creation of the power). Some jurisdictions have codified the doctrine. See, e.g., Ken.Rev.Stat. Sec. 381.216 (1972); Pa.Cons.Stat.Ann. Tit. 20 Sec. 6104 (1972 & Supp. 1988). The "wait and see" approach is particularly apt where options are concerned. See Hansen v. Stroecker, 699 P.2d 871 (Alaska 1985). Though eventually Massachusetts may consider adopting such a modification, see Sears, supra, 329 Mass. at 346, 108 N.E.2d at 566; Minot v. Paine, supra, 230 Mass. at 522, 120 N.E. at 170, the rule of law, strictly formulated, still appears to hold sway in the Commonwealth. Certified Corp., supra. See Springfield Safe Deposit & Trust Co. v. Ireland, supra, 268 Mass. at 66, 167 N.E. at 263.
 The approach, which seems correct to us, makes it unnecessary to wait-and-see. By the cutting of the duration of the first refusal right from the very start to the period of 21 years there is brought out of obscurity a contingency fixed from the outset so it must vest, if at all, within 21 years. The wait-and-see doctrine would, on the other hand, leave the contingency, when formed, potentially remote but if, in fact, it vested in 21 years the second look would rescue it.
 
 
 [20]
 It has, as things have developed, actually ripened in no more than 15 years
 
 
 [21]
 The terminology is criticized in I Jarman on Wills, 772-73 n. 2 (5th ed. 1893)
 
 
 [22]
 We express no opinion here or elsewhere as to the viability of a similar provision imposing restraints on the alienation of real estate. The historical preoccupation of the Rule Against Perpetuities with the preservation of unrestricted title and the alienability of real estate might mandate a different conclusion than we reach here. See Certified Corp., supra, 392 Mass. at 825, 467 N.E.2d at 1339; Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 152-53, 128 N.E. 177, 182-83 (1920). Cf. Ferrero, 311 Md. at 572-73, 536 A.2d at 1142-43 supra (rule against perpetuities implicated by right of first refusal to purchase real estate, as the rule was designed not only to facilitate the alienability of property but also to prevent restrictions that render title to land uncertain)
 
 
 [23]
 The Childs court observed:
 "Certainly our function is not to interpret the rule so as to create commercial anomalies. * * * [T]he parties to * * * [common business arrangements] do not suspect that the rule will be extended to invalidate their agreements; even the attorneys * * * may excusably not anticipate such application. Surely the courts do not seek to invalidate bona fide transactions by the imported application of esoteric legalisms. Our task is not to block the business pathway but to clear it, defining it by guideposts that are reasonably to be expected. * * * We therefore do not propose to apply the rule in the rigid or remorseless manner * * *; instead we shall seek to interpret it reasonably, in the light of its objectives and the economic conditions of modern society." Wong v. Di Grazia, 60 Cal.2d 525, 533, 35 Cal.Rptr. 241, 247, 386 P.2d 817, 823. Documents should be interpreted, if possible, so as to avoid the conclusion that they violate the rule against perpetuities.
 
 
 [24]
 Some courts have found that, where no durational limit is designated, an option must be exercised within a reasonable time under the circumstances. See Re Estate of Maguire, 204 Kan. 686, 466 P.2d 358 (1970), mod. on other grounds, 206 Kan. 1, 476 P.2d 618 (1970); Magee v. Mercantile-Commerce Bank & Trust Co., 343 Mo. 1022, 124 S.W.2d 1121 (1938). After all, in most contractual situations, if no duration is specified, and time is not of the essence, the law will imply a reasonable time. Williston on Contracts Sec. 575 (3d ed. 1961)
 
 
 [25]
 Likewise, the inherent policy concerns of the rule do not require its remorseless application in circumstances so unlike those concerning donative testamentary transfers, the rule's normal purview. Cf. Springfield Safe Deposit & Trust Co., supra (In a testamentary bequest situation, holding the rule to be one of law, which must be applied even though accomplishment of a testator's intent is thereby made impossible)